NORFOLK & WESTERN RAILWAY CO. ET AL. *v.*
AMERICAN TRAIN DISPATCHERS'
ASSOCIATION ET AL.

No. 89–1027.  Argued December 3, 1990—Decided March 19, 1991*

*Together with No. 89–1028, *CSX Transportation, Inc.* v. *Brotherhood of Railway Carmen et al.*, also on certiorari to the same court.

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, O'CONNOR, SCALIA, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 134.

*Jeffrey S. Berlin* argued the cause for petitioners in both cases. With him on the briefs for petitioners in No. 89–1027 were *Mark E. Martin* and *William P. Stallsmith, Jr. James S. Whitehead, Nicholas S. Yovanovic,* and *James D. Tomola* filed briefs for petitioner in No. 89–1028.

*Jeffrey S. Minear* argued the cause for the federal respondents in support of petitioners in both cases pursuant to this Court's Rule 12.4. On the briefs were *Acting Solicitor General Roberts, Deputy Solicitor General Shapiro, Lawrence S. Robbins, Robert S. Burk, Henri F. Rush,* and *John J. McCarthy, Jr.*

*William G. Mahoney* argued the cause for the union respondents in both cases. With him on the brief was *John O'B. Clarke, Jr.*†

---

†*Richard T. Conway, Ralph J. Moore, Jr., D. Eugenia Langan,* and *David P. Lee* filed a brief for the National Railway Labor Conference as *amicus curiae* urging reversal.

JUSTICE KENNEDY delivered the opinion of the Court.

The Interstate Commerce Commission has the authority to approve rail carrier consolidations under certain conditions. 49 U. S. C. § 11301 *et seq.* A carrier in an approved consolidation "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [it] carry out the transaction . . . ." § 11341(a). These cases require us to decide whether the carrier's exemption under § 11341(a) "from all other law" extends to its legal obligations under a collective-bargaining agreement. We hold that it does.

I

A

"Prior to 1920, competition was the *desideratum* of our railroad economy." *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.,* 347 U. S. 298, 315 (1954). Following a period of Government ownership during World War I, however, "many of the railroads were in very weak condition and their continued survival was in jeopardy." *Ibid.* At that time, the Nation made a commitment to railroad carrier consolidation as a means of promoting the health and efficiency of the railroad industry. Beginning with the Transportation Act of 1920, ch. 91, 41 Stat. 456, "consolidation of the railroads of the country, in the interest of economy and efficiency, became an established national policy . . . so intimately related to the maintenance of an adequate and efficient rail transportation system that the 'public interest' in the one cannot be dissociated from that in the other." *United States* v. *Lowden,* 308 U. S. 225, 232 (1939). See generally *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co., supra,* at 315–321.

Chapter 113 of the Interstate Commerce Act, recodified in 1978 at 49 U. S. C. § 11301 *et seq.,* contains the current statement of this national policy. The Act grants the Interstate Commerce Commission exclusive authority to examine, condition, and approve proposed mergers and consolidations of

transportation carriers within its jurisdiction. § 11343(a)(1). The Act requires the Commission to "approve and authorize" the transactions when they are "consistent with the public interest." § 11344(c). Among the factors the Commission must consider in making its public interest determination are "the interests of carrier employees affected by the proposed transaction." § 11344(b)(1)(D).[1] In authorizing a merger or consolidation, the Commission "may impose conditions governing the transaction." § 11344(c). Once the Commission approves a transaction, a carrier is "exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [it] carry out the transaction." § 11341(a).

When a proposed merger involves rail carriers, the Act requires the Commission to impose labor-protective conditions on the transaction to safeguard the interests of adversely affected railroad employees. § 11347. In *New York Dock Railway—Control—Brooklyn Eastern Dist. Terminal,* 360 I. C. C. 60, 84–90, aff'd *sub nom. New York Dock Railway* v. *United States,* 609 F. 2d 83 (CA2 1979), the Commission announced a comprehensive set of conditions and procedures designed to meet its obligations under § 11347. Section 2 of the *New York Dock* conditions provides that the "rates of pay, rules, working conditions and all collective

---

[1] Section 11344(b)(1) provides:

"In a proceeding under this section which involves the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall consider at least the following:

"(A) the effect of the proposed transaction on the adequacy of transportation to the public.

"(B) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

"(C) the total fixed charges that result from the proposed transaction.

"(D) the interest of carrier employees affected by the proposed transaction.

"(E) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region."

bargaining and other rights, privileges and benefits . . . under applicable laws and/or existing collective bargaining agreements . . . shall be preserved unless changed by future collective bargaining agreements." 360 I. C. C., at 84. Section 4 sets forth negotiation and arbitration procedures for resolution of labor disputes arising from an approved railroad merger. *Id.*, at 85. Under § 4, a merged or consolidated railroad which plans an operational change that may cause dismissal or displacement of any employee must provide the employee and his union 90 days' written notice. *Ibid.* If the carrier and union cannot agree on terms and conditions within 30 days, each party may submit the dispute for an expedited "final, binding and conclusive" determination by a neutral arbitrator. *Ibid.* Finally, the *New York Dock* conditions provide affected employees with up to six years of income protection, as well as reimbursements for moving costs and losses from the sale of a home. See *id.*, at 86–89 (§§ 5–9, 12).

## B

The two cases before us today involve separate ICC orders exempting parties to approved railway mergers from the provisions of collective-bargaining agreements.

1. In No. 89–1027, the Commission approved an application by NWS Enterprises, Inc., to acquire control of two previously separate rail carriers, petitioners Norfolk and Western Railway Company (N&W) and Southern Railway Company (Southern). See *Norfolk Southern Corp.—Control—Norfolk & W. R. Co. and Southern R. Co.*, 366 I. C. C. 173 (1982). In its order approving control, the Commission imposed the standard *New York Dock* labor-protective conditions and noted the possibility that "further displacement [of employees] may arise as additional coordinations occur." 366 I. C. C., at 230–231.

In September 1986, this possibility became a reality. The carriers notified the American Train Dispatchers' Association, the bargaining representative for certain N&W employ-

ees, that they proposed to consolidate all "power distribution"—the assignment of locomotives to particular trains and facilities—for the N&W-Southern operation. To effect the efficiency move, the carriers informed the union that they would transfer work performed at the N&W power distribution center in Roanoke, Virginia, to the Southern center in Atlanta, Georgia. The carriers proposed an implementing agreement in which affected N&W employees would be made management supervisors in Atlanta, and would receive increases in wages and benefits in addition to the relocation expenses and wage protections guaranteed by the *New York Dock* conditions. The union contended that this proposal involved a change in the existing collective-bargaining agreement that was subject to mandatory bargaining under the Railway Labor Act (RLA), 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.* The union also maintained that the carriers were required to preserve the affected employees' collective-bargaining rights, as well as their right to union representation under the RLA.

Pursuant to § 4 of the *New York Dock* procedures, the parties negotiated concerning the terms of the implementing agreement, but they failed to resolve their differences. As a result, the carriers invoked the *New York Dock* arbitration procedures. After a hearing, the arbitration committee ruled in the carriers' favor. The committee noted that the transfer of work to Atlanta was an incident of the control transaction approved by the ICC, and that it formed part of the "additional coordinations" the ICC predicted would be necessary to achieve "greater efficiencies." The committee also held it had the authority to abrogate the provisions of the collective-bargaining agreement and of the RLA as necessary to implement the merger. Finally, it held that because the application of the N&W bargaining agreement would impede the transfer, the transferred employees did not retain their collective-bargaining rights.

The union appealed to the Commission, which affirmed by a divided vote. It explained that "[i]t has long been the Commission's view that private collective bargaining agreements and [Railway Labor Act] provisions must give way to the Commission-mandated procedures of section 4 [of the *New York Dock* conditions] when parties are unable to agree on changes in working conditions required to implement a transaction authorized by the Commission." App. to Pet. for Cert. in No. 89–1027, p. 33a. Accordingly, the Commission upheld the arbitration committee's determination that the "compulsory, binding arbitration required by Article I, section 4 of *New York Dock*, took precedence over RLA procedures whether asserted independently or based on existing collective bargaining agreements." *Id.*, at 35a. The Commission also held that because the work transfer was incident to the approved merger, it was "immunized from conflicting laws by section 11341(a)." *Ibid.* Noting that "[i]mposition of the collective bargaining agreement would jeopardize the transaction because the work rules it mandates are inconsistent with the carriers' underlying purpose of integrating the power distribution function," the Commission upheld the decision to override the collective-bargaining agreement and RLA provisions. *Id.*, at 37a.

2. In No. 89–1028, the Commission approved an application by CSX Corporation to acquire control of the Chessie System, Inc., and Seaboard Coastline Industries, Inc. *CSX Corp.—Control—Chessie System, Inc., and Seaboard Coastline Industries, Inc.*, 363 I. C. C. 521 (1980). Chessie was the parent of the Chesapeake and Ohio Railway Company and the Baltimore and Ohio Railway Company; Seaboard was the parent of the Seaboard Coast Line Railroad Company. In approving the control acquisition, the Commission imposed the *New York Dock* conditions and recognized that "additional coordinations may occur that could lead to further employee displacements." 363 I. C. C., at 589.

In August 1986, the consolidated carrier notified respondent Brotherhood of Railway Carmen that it planned to close Seaboard's heavy freight car repair shop at Waycross, Georgia, and transfer the Waycross employees to Chessie's similar shop in Raceland, Kentucky. The carrier informed the Brotherhood that the proposed transfer would result in a net decrease of jobs at the two shops. Pursuant to *New York Dock*, the carrier and the union negotiated concerning the terms of an agreement to implement the transfer. The sticking point in the negotiations involved a 1966 collective-bargaining agreement between the union and Seaboard known as the "Orange Book." The Orange Book provided that the carrier would employ each covered employee and maintain each employee's work conditions and benefits for the remainder of the employee's working life. The Brotherhood contended that the Orange Book prevented CSX from moving work or covered employees from Waycross to Raceland.

When negotiations broke down, both the union and the carrier invoked the arbitration procedures under §4 of *New York Dock*. The arbitration committee ruled for the carrier. It agreed with the union that the Orange Book prohibited the proposed transfer of work and employees. It determined, however, that it could override any Orange Book or RLA provision that impeded an operational change authorized or required by the ICC's decision approving the original merger. The committee then held that the carrier could transfer the heavy repair work, which it found necessary to the original control acquisition, but could not transfer employees protected by the Orange Book, which it found would only slightly impair the original control acquisition. Both parties appealed the award to the Commission.

A divided Commission affirmed in part and reversed in part. The Commission agreed the committee possessed authority to override collective-bargaining rights and RLA rights that prevent implementation of a proposed transac-

tion. It reasoned, however, that "[i]mposition of an Orange Book employee exception would effectively prevent implementation of the proposed transaction." *CSX Corp.—Control—Chessie System, Inc. and Seaboard Coast Line Industries, Inc.*, 4 I. C. C. 2d 641, 650 (1988). The Commission thus affirmed the arbitration committee's order permitting the transfer of work but reversed the holding that the carriers could not transfer Orange Book employees.

3. The unions appealed both cases to the United States Court of Appeals for the District of Columbia Circuit. The Court of Appeals considered the cases together and reversed and remanded to the Commission. *Brotherhood of Railway Carmen* v. *ICC*, 279 U. S. App. D. C. 239, 880 F. 2d 562 (1989). The court held that § 11341(a) does not authorize the Commission to relieve a party of collective-bargaining agreement obligations that impede implementation of an approved transaction. The court stated various grounds for its conclusion. First, because the court did not read the phrase "all other law" in § 11341(a) to include "all legal obstacles," it found "no support in the language of the statute" to apply the statute to obligations imposed by collective-bargaining agreements. *Id.*, at 244, 880 F. 2d, at 567. Second, the court analyzed the Transportation Act of 1920, ch. 91, § 407, 41 Stat. 482, which contained a predecessor to § 11341(a), and found that Congress "did not intend, when it enacted the immunity provision, to override contracts." 279 U. S. App. D. C., at 247, 880 F. 2d, at 570. The court noted that Congress had "focused nearly exclusively . . . on specific types of laws it intended to eliminate—all of which were positive enactments, not common law rules of liability, as on a contract." *Ibid.* The court further noted that Congress had often revisited the immunity provision without making it clear that it included contracts or collective-bargaining agreements. *Ibid.* Finally, the court did not defer to the ICC's interpretation of the Act, presumably because it determined that the Commission's interpretation was belied by the contrary " 'unambigu-

ously expressed intent of Congress,'" *id.*, at 244, 880 F. 2d, at 567 (quoting *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984)).

In ruling that § 11341(a) did not apply to collective-bargaining agreements, the court "decline[d] to address the question" whether the section could operate to override provisions of the RLA. *Brotherhood of Railway Carmen, supra*, at 247–250, 880 F. 2d, at 570–573. It also declined to consider whether the labor-protective conditions required by § 11347 are exclusive, or whether § 4 of the *New York Dock* conditions gives an arbitration committee the right to override provisions of a collective-bargaining agreement. 279 U. S. App. D. C., at 250, 880 F. 2d, at 573. The court remanded the case to the Commission for a determination on these issues.

After the Court of Appeals denied the carriers' petitions for rehearing, the carriers in the consolidated cases filed petitions for certiorari, which we granted on March 26, 1990. 494 U. S. 1055.[2] We now reverse.

---

[2] On September 9, 1989, the Commission also filed a petition for rehearing, and requested the court to refrain from ruling on the petition until the Commission could issue a comprehensive decision on remand addressing issues that the Court of Appeals left open for resolution. On September 29, 1989, the Court of Appeals issued an order stating that the Commission's petition for rehearing would be "deferred pending release of the ICC's decision on remand." App. to Pet. for Cert. in No. 89–1027, p. 54a.

On January 4, 1990, the Commission reopened proceedings in the case remanded to it. On May 21, 1990, two months after we granted the carriers' petitions for certiorari, the Commission issued its remand decision. *CSX Corp.—Control—Chessie System, Inc. and Seaboard Coast Line Industries, Inc.*, 6 I. C. C. 2d 715. In its decision, the Commission adhered to the Court of Appeals' ruling that § 11341(a) did not authorize it to override provisions of a collective-bargaining agreement. The Commission held, however, that § 11341(a) authorized it to foreclose resort to RLA remedies for modification and enforcement of collective-bargaining agreements "at least to the extent of [its] authority" to impose labor-protective conditions under § 11347. *Id.*, at 754. The Commission explained that the § 11347 limit on its § 11341(a) authority "reflects the consistency of the

## II

Title 49 U. S. C. § 11341(a) provides:

> ". . . A carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction. . . ."

We address the narrow question whether the exemption in § 11341(a) from "all other law" includes a carrier's legal obligations under a collective-bargaining agreement.

By its terms, the exemption applies only when *necessary* to carry out an *approved* transaction. These predicates, however, are not at issue here, for the Court of Appeals did not pass on them and the parties do not challenge them. For purposes of this decision, we assume, without deciding, that the Commission properly considered the public interest factors of § 11344(b)(1) in approving the original transaction, that its decision to override the carriers' obligations is consistent with the labor-protective requirements of § 11347, and that the override was necessary to the implementation of the transaction within the meaning of § 11341(a). Under these

overall statutory scheme for dealing with CBA modifications required to implement Commission-approved mergers and consolidations." *Id.*, at 722. The Commission remanded its decision to the parties for further negotiation or arbitration.

On December 4, 1990, the union respondents petitioned the Court of Appeals for review of the Commission's remand decision. The petition raises three issues: (1) whether § 11341(a) authorizes the ICC to foreclose employee resort to the RLA; (2) whether § 11347 authorizes the ICC to compel employees to arbitrate changes in collective-bargaining agreements; and (3) whether abrogation of employee contract rights effected a taking in violation of the Due Process and Just Compensation Clauses of the Fifth Amendment.

assumptions, we hold that the exemption from "all other law" in § 11341(a) includes the obligations imposed by the terms of a collective-bargaining agreement.[3]

As always, we begin with the language of the statute and ask whether Congress has spoken on the subject before us. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U. S., at 842–843. The contested language in § 11341(a), exempting carriers from "the antitrust laws and all other law, including State and municipal law," is clear, broad, and unqualified. It does not admit of the distinction the Court of Appeals drew, based on its analysis of legislative history, between positive enactments and common-law rules of liability. Nor does it support the Court of Appeals' conclusion that Congress did not intend the immunity clause to apply to contractual obligations.

---

[3] On May 23, 1990, and again on September 19, 1990, the union respondents filed motions to dismiss the case as moot. They argued that in light of the alternative ground for decision offered by the ICC on remand from the Court of Appeals, see n. 2, *supra*, the meaning and scope of § 11341(a) was no longer material to the dispute. The union respondents reassert their mootness argument in their brief on the merits. Brief for Respondent Unions 18.

We disagree. The Commission predicated the analysis in its remand order on the correctness of the Court of Appeals' interpretation of § 11341(a). Thus, our definitive interpretation of § 11341(a) may affect the Commission's remand order. Agency compliance with the Court of Appeals' mandate does not moot the issue of the correctness of the court's decision. See, *e. g.*, *Cornelius* v. *NAACP Legal Defense & Educational Fund, Inc.*, 473 U. S. 788, 791, n. 1 (1985); *Schweiker* v. *Gray Panthers*, 453 U. S. 34, 42, n. 12 (1981); *Maher* v. *Roe*, 432 U. S. 464, 468–469, n. 4 (1977). In addition, the alternative basis offered by the Commission on remand does not end the controversy between the parties. The parties retain an interest in the validity of the ICC's original order because the Court of Appeals may again disagree with the Commission's interpretation of the Act in its review of the remand order.

By itself, the phrase "all other law" indicates no limitation. The circumstance that the phrase "all other law" is in addition to coverage for "the antitrust laws" does not detract from this breadth. There is a canon of statutory construction which, on first impression, might seem to dictate a different result. Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration. See *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 84–85 (1990). The canon does not control, however, when the whole context dictates a different conclusion. Here, there are several reasons the immunity provision cannot be interpreted to apply only to antitrust laws and similar statutes. First, because "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored," *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 350 (1963), Congress may have determined that it should make a clear and separate statement to include antitrust laws within the general exemption of § 11341(a). Second, the otherwise general term "all other law" "includ[es]" (but is not limited to) "State and municipal law." This shows that "all other law" refers to more than laws related to antitrust. Also, the fact that "all other law" entails more than "the antitrust laws," but is not limited to "State and municipal law," reinforces the conclusion, inherent in the word "all," that the phrase "all other law" includes federal law other than the antitrust laws. In short, the immunity provision in § 11341 means what it says: A carrier is exempt from *all law* as necessary to carry out an ICC-approved transaction.

The exemption is broad enough to include laws that govern the obligations imposed by contract. "The obligation of a contract is 'the law which binds the parties to perform their agreement.'" *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 429 (1934) (quoting *Sturges* v. *Crowninshield*, 4 Wheat. 122, 197 (1819)). A contract depends on a re-

gime of common and statutory law for its effectiveness and enforcement.

> "Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge." *Farmers and Merchants Bank of Monroe* v. *Federal Reserve Bank of Richmond,* 262 U. S. 649, 660 (1923).

A contract has no legal force apart from the law that acknowledges its binding character. As a result, the exemption in § 11341(a) from "all other law" effects an override of contractual obligations, as necessary to carry out an approved transaction, by suspending application of the law that makes the contract binding.

*Schwabacher* v. *United States,* 334 U. S. 182 (1948), which construed the immediate precursor of § 11341(a), § 5(11) of the Transportation Act of 1940, ch. 722, § 7, 54 Stat. 908–909,[4] supports this conclusion. In *Schwabacher,* minority stockholders in a carrier involved in an ICC-approved merger complained that the terms of the merger diminished the value of their shares as guaranteed by the corporate char-

---

[4] Section 5(11) of the Transportation Act of 1940 provided:

"[A]ny carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the antitrust laws and all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission. . . ."

The recodification of this language in § 11341(a) effected no substantive change. See H. R. Rep. No. 95–1395, pp. 158–160 (1978). See also *ICC* v. *Locomotive Engineers,* 482 U. S. 270, 299, n. 12 (1987) (STEVENS, J., concurring in judgment).

ter and thus "deprived [them] of contract rights under Michigan law . . . ." 334 U. S., at 188. We explained that the Commission was charged under the Act with passing upon and approving all capital liabilities assumed or discharged by the merged company, and that once the Commission approved a merger in the public interest and on just and reasonable terms, the immunity provision relieved the parties to the merger of "restraints, limitations, and prohibitions of law, Federal, State, or municipal," as necessary to carry out the transaction. *Id.*, at 194–195, 198. We noted that before approving the merger, the Commission had a duty "to see that minority interests are protected," and emphasized that any such minority rights were, "as a matter of federal law, accorded recognition in the obligation of the Commission not to approve any plan which is not just and reasonable." *Id.*, at 201. Once these interests were accounted for, however, "[i]t would be inconsistent to allow state law to apply a liquidation basis [for valuation] to what federal law designates as a basis for continued public service." *Id.*, at 200. Relying in part on the immunity provision, we held the contract rights protected by state law did not survive the merger agreement found by the Commission to be in the public interest. *Id.*, at 194–195, 200–201. Because the Commission had disclaimed jurisdiction to settle the shareholders' complaints, we remanded the case to the Commission to ensure that the terms of the merger were just and reasonable. *Id.*, at 202.

Just as the obligations imposed by state contract law did not survive the merger at issue in *Schwabacher*, the obligations imposed by the law that gives force to the carriers' collective-bargaining agreements, the RLA, do not survive the merger in this case. The RLA governs the formation, construction, and enforcement of the labor-management contracts in issue here. It requires carriers and employees to make reasonable efforts "to make and maintain" collective-bargaining agreements, 45 U. S. C. § 152 First, and to refrain from making changes in existing agreements except in

accordance with RLA procedures, 45 U. S. C. §§ 152 Seventh, 156. The Act "extends both to disputes concerning the making of collective agreements and to grievances arising under existing agreements." *Slocum* v. *Delaware, L. & W. R. Co.*, 339 U. S. 239, 242 (1950). As the law which gives "legal and binding effect to collective agreements," *Detroit & T. S. L. R. Co.* v. *United Transportation Union*, 396 U. S. 142, 156 (1969), the RLA is the law that, under § 11341(a), is superseded when an ICC-approved transaction requires abrogation of collective-bargaining obligations. See *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 287 (1987) (STEVENS, J., concurring in judgment); *Brotherhood of Locomotive Engineers* v. *Boston & Maine Corp.*, 788 F. 2d 794, 801 (CA1 1986); *Missouri Pacific R. Co.* v. *United Transportation Union*, 782 F. 2d 107, 111 (CA8 1986); *Burlington Northern, Inc.* v. *American Railway Supervisors Assn.*, 503 F. 2d 58, 62–63 (CA7 1974); *Bundy* v. *Penn Central Co.*, 455 F. 2d 277, 279–280 (CA6 1972); *Nemitz* v. *Norfolk & Western R. Co.*, 436 F. 2d 841, 845 (CA6), aff'd, 404 U. S. 37 (1971); *Brotherhood of Locomotive Engineers* v. *Chicago & N. W. R. Co.*, 314 F. 2d 424 (CA8 1963); *Texas & N. O. R. Co.* v. *Brotherhood of Railroad Trainmen*, 307 F. 2d 151, 161–162 (CA5 1962); *Railway Labor Executives Assn.* v. *Guilford Transp. Industries, Inc.*, 667 F. Supp. 29, 35 (Me. 1987), aff'd, 843 F. 2d 1383 (CA1 1988).

Our determination that § 11341(a) supersedes collective-bargaining obligations via the RLA as necessary to carry out an ICC-approved transaction makes sense of the consolidation provisions of the Act, which were designed to promote "economy and efficiency in interstate transportation by the removal of the burdens of excessive expenditure." *Texas* v. *United States*, 292 U. S. 522, 534–535 (1934). The Act requires the Commission to approve consolidations in the public interest. 49 U. S. C. § 11343(a)(1). Recognizing that consolidations in the public interest will "result in wholesale dismissals and extensive transfers, involving expense to

transferred employees" as well as "the loss of seniority rights," *United States* v. *Lowden*, 308 U. S. 225, 233 (1939), the Act imposes a number of labor-protecting requirements to ensure that the Commission accommodates the interests of affected parties to the greatest extent possible. 49 U. S. C. §§ 11344(b)(1)(D), 11347; see also *New York Dock Railway— Control—Brooklyn Eastern Dist. Terminal*, 360 I. C. C. 60 (1979). Section 11341(a) guarantees that once these interests are accounted for and once the consolidation is approved, obligations imposed by laws such as the RLA will not prevent the efficiencies of consolidation from being achieved. If § 11341(a) did not apply to bargaining agreements enforceable under the RLA, rail carrier consolidations would be difficult, if not impossible, to achieve. The resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated. See, *e. g.*, *Burlington Northern R. Co.* v. *Maintenance of Way Employes*, 481 U. S. 429, 444 (1987) (resolution procedures for major disputes "virtually endless"); *Detroit & T. S. L. R. Co.* v. *United Transportation Union*, 396 U. S. 142, 149 (1969) (dispute resolution under RLA involves "an almost interminable process"); *Railway Clerks* v. *Florida East Coast R. Co.*, 384 U. S. 238, 246 (1966) (RLA procedures are "purposely long and drawn out"). The immunity provision of § 11341(a) is designed to avoid this result.

We hold that, as necessary to carry out a transaction approved by the Commission, the term "all other law" in § 11341(a) includes any obstacle imposed by law. In this case, the term "all other law" in § 11341(a) applies to the substantive and remedial laws respecting enforcement of collective-bargaining agreements. Our construction of the clear statutory command confirms the interpretation of the agency charged with its administration and expert in the field of railroad mergers. We affirm the Commission's interpretation of § 11341(a), not out of deference in the face of an

ambiguous statute, but rather because the Commission's interpretation is the correct one.

This reading of § 11341(a) will not, as the Court of Appeals feared, lead to bizarre results. *Brotherhood of Railway Carmen* v. *ICC*, 279 U. S. App. D. C., at 244, 880 F. 2d, at 567. The immunity provision does not exempt carriers from all law, but rather from all law necessary to carry out an approved transaction. We reiterate that neither the conditions of approval, nor the standard for necessity, is before us today. It may be, as the Commission held on remand from the Court of Appeals, that the scope of the immunity provision is limited by § 11347, which conditions approval of a transaction on satisfaction of certain labor-protective conditions. See n. 2, *supra*. It also might be true that "[t]he breadth of the exemption [in § 11341(a)] is defined by the scope of the approved transaction . . . ." *ICC* v. *Locomotive Engineers, supra,* at 298 (STEVENS, J., concurring in judgment). We express no view on these matters, as they are not before us here.

The judgment of the Court of Appeals is reversed, and the cases are remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

The statutory exemption that the Court construes today had its source in § 407 of the Transportation Act of 1920 (1920 Act). 41 Stat. 482. Its wording was slightly changed in 1940, 54 Stat. 908–909, and again in 1978, 92 Stat. 1434. There is, however, no claim that either of those amendments modified the coverage of the exemption in any way. It is therefore appropriate to begin with a consideration of the purpose and the text of the 1920 Act.

Before the First World War, the railroad industry had been the prime target of antitrust enforcement.[1]   In 1920, however, Congress adopted a new national transportation policy that expressly favored the consolidation of railroads. The policy of consolidation embodied in the 1920 Act would obviously have been frustrated by the federal antitrust laws had Congress not chosen to exempt explicitly all approved mergers from these laws.   Section 407 of that Act provided, in part:

> "The carriers affected by any order made under the foregoing provisions of this section . . . shall be, and they are hereby, relieved from the operation of the 'antitrust laws,' . . . and of all other restraints or prohibitions by law, State or Federal, in so far as may be necessary to enable them to do anything authorized or required by any order made under and pursuant to the foregoing provisions of this section."   41 Stat. 482.

Both the background and the text of § 407 make it absolutely clear that its primary focus was on federal antitrust laws.   Sensibly, however, Congress wrote that section using language broad enough to cover any other federal or state law that might otherwise forbid the consummation of any approved merger or prevent the immediate operation of its properties under a new corporate owner.   Not a word in the statute, or in its legislative history, contains any hint that the approval of a merger by the Interstate Commerce Commission (ICC) would impair the obligations of valid and otherwise enforceable private contracts.

Given the present plight of our Nation's railroads, it may be wise policy to give the ICC a power akin to, albeit greater

---

[1] See *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290 (1897); *United States* v. *Joint Traffic Assn.*, 171 U. S. 505 (1898); *Northern Securities Co.* v. *United States*, 193 U. S. 197 (1904); *United States* v. *Terminal Railroad Assn. of St. Louis*, 224 U. S. 383 (1912); *United States* v. *Union Pacific R. Co.*, 226 U. S. 61 (1912); *United States* v. *Pacific & Arctic R. & Nav. Co.*, 228 U. S. 87 (1913).

than, that of a bankruptcy court to approve a trustee's rejection of a debtor's executory private contracts.[2] Through nothing short of a *tour de force,* however, can one find any such power in 49 U. S. C. § 11341, or in either of its predecessors. Obviously, consolidated carriers would find it useful to have the ability to disavow disadvantageous long-term leases on obsolete car repair facilities, employment contracts with high salaried executives whose services are no longer needed, as well as collective-bargaining agreements that provide costly job security to a shrinking work force. If Congress had intended to give the ICC such broad ranging power to impair contracts, it would have done so in language much clearer than anything that can be found in the present Act.

The Court's contrary conclusion rests on its reading of the "plain meaning" of the present statutory text and our decision in *Schwabacher* v. *United States,* 334 U. S. 182 (1948). Neither of these reasons is sufficient. Moreover, the Court's reading is inconsistent with other unambiguous provisions in the statute.

## I

With or without the *ejusdem generis* canon, I believe that the normal reader would assume that the text of § 11341 encompasses the antitrust laws, as well as other federal or state laws, that would otherwise prohibit rail carriers from consummating approved mergers, and nothing more. See *ante,* at 128. That text contains no suggestion that whenever a criminal law, tort law, or any regulatory measure impedes the efficient operation of a new merged carrier, the carrier can avoid such a restriction by virtue of the ICC approval of that merger. Nor does the text of § 11341 contain any sug-

---

[2] Section 365 of the Bankruptcy Code, 11 U. S. C. § 365, allows a trustee to assume or reject a debtor's executory contracts and unexpired leases subject to the *subsequent* approval of the bankruptcy court. Collective-bargaining agreements can be rejected only if the additional requirements of 11 U. S. C. § 1113 are met.

gestion that such an approval would impair the obligation of private contracts.[3] Rather, as both an application of the *ejusdem generis* canon and an examination of the legislative history show, the purpose of the exemption was to relieve the carriers "from the operation of the antitrust *and other restrictive or prohibitory laws.*" H. R. Conf. Rep. No. 650, 66th Cong., 2d Sess., 64 (1920) (emphasis added).

The Court speculates that the reason the 1920 Congress explicitly referred to the antitrust laws was simply to avoid the force of the rule that repeals of the antitrust laws by implication are not favored, citing *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 350 (1963). In that case, however, the rule was announced in the context of the industry's argument that federal regulatory approval of a transaction exempted the transaction from the antitrust laws even though the regulatory statute was entirely silent on the subject of exemption. *Ibid.* The authority cited in the *Phila-*

---

[3] As Judge D. H. Ginsburg, writing for the Court of Appeals, noted:

"We cannot sustain the ICC's position that this provision empowers it to override a [collective-bargaining agreement (CBA)]. First, and most important, the ICC's position finds no support in the language of the statute. By its terms, § 11341(a) contemplates exemption only from 'the antitrust laws and from all other law' to the extent necessary to carry out the transaction. Nowhere does it say that the ICC may also override contracts, nor has it ever, in any of the various iterations since its initial enactment in 1920, included even a general reference to 'contracts,' much less any specific reference to CBAs. Nor has the ICC explained how we can read the term 'other law,' as it has done, to mean 'all legal obstacles.' *Dispatchers*, J. A. 207. None of the Supreme Court decisions, discussed below, authorizing the ICC to abrogate an 'other law' even suggests that the term means 'all legal obstacles.' The ICC itself, prior to its 1983 decision in *DRGW*, recognized as much. See *Gulf, Mobile & Ohio R. R. Co.—Abandonment*, 282 I. C. C. 311, 335 (1952) ('None of the decisions in the [Supreme Court] cases . . . relates to private contractual rights, but refers [sic] to State laws which prohibit in some way the carrying out of the transaction authorized.')." *Brotherhood of Railway Carmen* v. *ICC*, 279 U. S. App. D. C. 239, 244, 880 F. 2d 562, 567 (1989).

*delphia* decision to support this rule sheds no light on the question whether a statute creating a broad exemption for mergers would naturally be read to include all statutes that otherwise would have prohibited the consummation of a merger of large rail carriers.[4]

Of greater importance, however, is the Court's rather remarkable assumption that an exemption "from 'all other

---

[4] All but two of the cases that the Court cited in the *Philadelphia* decision to support the rule against implicit repeals of the antitrust statutes arose under a regulatory framework in which there was no mention of exemption. *United States* v. *Philadelphia Nat. Bank*, 374 U. S. 321, 350, n. 28 (1963). See *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S., at 314–315; *United States* v. *Joint Traffic Assn.*, 171 U. S. 505 (1898); *Northern Securities Co.* v. *United States*, 193 U. S., at 343, 374–376 (plurality and dissenting opinions); *United States* v. *Pacific & Arctic R. & Nav. Co.*, 228 U. S., at 105, 107; *Keogh* v. *Chicago & Northwestern R. Co.*, 260 U. S. 156, 161–162 (1922); *Central Transfer Co.* v. *Terminal Railway Assn. of St. Louis*, 288 U. S. 469, 474–475 (1933); *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U. S. 500, 513–515 (1936); *United States* v. *Borden Co.*, 308 U. S. 188, 197–206 (1939); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 226–228 (1940); *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 456–457 (1945); *United States Alkali Export Assn., Inc.* v. *United States*, 325 U. S. 196, 205–206 (1945); *Allen Bradley Co.* v. *Electrical Workers*, 325 U. S. 797, 809–810 (1945); *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 9 (1958); *United States* v. *Radio Corp. of America*, 358 U. S. 334 (1959); *California* v. *FPC*, 369 U. S. 482 (1962); *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963). The other two cases involve regulations with explicit exemptions from the antitrust laws, but do not support the position taken by the Court in this case. In *Maryland & Virginia Milk Producers Assn., Inc.* v. *United States*, 362 U. S. 458 (1960), this Court held that § 6 of the Clayton Act's exemption of agricultural cooperatives from the antitrust law only protected the formation of those associations; once formed they could not engage in any further conduct that would violate the antitrust laws. In *Pan American World Airways, Inc.* v. *United States*, 371 U. S. 296 (1963), the Court held that the exemption relieving airlines from the operation of the antitrust laws when certain transactions were approved by the Civil Aeronautics Board did not exempt the airlines from all antitrust violations, but only exempted them from violations stemming from activity explicitly governed by the regulatory scheme.

law'" should be read to encompass the restraints created by private contract.[5] *Ante*, at 129–130. Even if the text of the present Act could bear that reading, it is flatly inconsistent with the text of the 1920 Act, which relieved the participating carriers "from the operation of the 'antitrust laws' . . . and of all other restraints or prohibitions by law, State or federal . . . ." 41 Stat. 482. Moreover, given the respect that our legal system has always paid to the enforceability of private contracts—a respect that is evidenced by express language in the Constitution itself[6]—there should be a powerful presumption against finding an implied authority to impair contracts in a statute that was enacted to alleviate a legitimate concern about the antitrust laws. Had Congress intended to convey the message the Court finds in § 11341, it surely would have said expressly that the exemption was from all restraints imposed by law or by private contract.[7]

---

[5] Again Judge Ginsburg's observation is pertinent:

"Moreover, the ICC's proposed insertion of 'all legal obstacles' into the statutory language would lead to most bizarre results. Under the ICC's reading, it could set to naught, in order to facilitate a merger, a carrier's solemn undertaking, in a bond indenture or a bank loan, to refrain from entering into any such transaction without the consent of its creditors. *Cf. Gulf, Mobile & Ohio,* 282 I. C. C. at 331–35 (declaring itself without power, in an abandonment context, to relieve a carrier from its 'contractual obligations for the payment of rent'). We do not think it likely that Congress would grant the ICC a power with so much potential to destabilize the railroad industry; we are confident, however, that it would not do so without so much as a word to that effect in the statute itself. Never, either in its decisions here under review or in prior cases, has the ICC offered any justification for this most unlikely reading of the Act." 279 U. S. App. D. C., at 244–245, 880 F. 2d, at 567–568.

[6] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U. S. Const., Art. I, § 10, cl. 1.

[7] After reviewing the legislative history, Judge Ginsburg concluded:

"From our review of this history, we are confident that Congress did not intend, when it enacted the immunity provision, to override contracts. First, Congress focused nearly exclusively, in the hearings and debates on the 1920 Act, on specific types of laws it intended to eliminate—all of which were positive enactments, not common law rules of liability, as on a con-

## II

In my opinion, the Court's reliance on the decision in *Schwabacher* v. *United States*, 334 U. S. 182 (1948), is misplaced. In that case, the owners of two percent of the outstanding preferred stock of the Pere Marquette Railway brought suit in the United States District Court to set aside an ICC order approving a merger between that corporation and the Chesapeake and Ohio Railway Corporation. In approving the merger, the ICC had found that the market value of plaintiffs' preferred shares ranged, at different times, from $87 to $99 per share, and that the stock that they received in exchange pursuant to the merger agreement would have realized about $90 and $111 on the same dates. Thus, the terms of the merger, as applied to the plaintiffs' class, were just and reasonable. Plaintiffs contended, however, that the exchange value of their shares amounted to $172.50 per share because the merger was a "liquidation" as a matter of Michigan law, and the Pere Marquette Charter provided that in the event of liquidation or dissolution, the preferred shareholders were entitled to receive full payment of par value plus all accrued unpaid dividends.

The ICC order approving the merger did not resolve the Michigan law question. The ICC considered the issue too insignificant to affect the validity of the entire transaction, and left the matter for resolution by negotiation or later litigation. On appeal from the District Court's judgment sustaining the ICC order, this Court held that the ICC's finding that the exchange value was just and reasonable foreclosed any other claim that the dissenting shareholders might assert

tract. *Cf. Association of Flight Attendants* v. *Delta Air Lines, Inc.,* 879 F. 2d 906, 917 (D. C. Cir. 1989). Indeed, Commissioner Clark, who presented the immunity idea to the House and Senate Commerce Committees in the hearings cited above, did not once suggest, over the course of several days and several hundred pages, that the proposed immunity might relieve a carrier of its obligations under negotiated agreements with third parties." 279 U. S. App. D. C., at 247, 880 F. 2d, at 570.

concerning the value of their shares. Whatever Michigan law might provide for the preferred shareholders in the event of a winding-up or liquidation could not determine the just and reasonable value of shares in the continuing enterprise. The essence of the Court's holding is set forth in this passage:

> "Since the federal law clearly contemplates merger as a step in continuing the enterprise, it follows that what Michigan law might give these dissenters on a winding-up or liquidation is irrelevant, except insofar as it may be reflected in current values for which they are entitled to an equivalent. It would be inconsistent to allow state law to apply a liquidation basis to what federal law designates as a basis for continued public service. . . .
>
> .        .        .        .        .
>
> "We therefore hold that no rights alleged to have been granted to dissenting stockholders by state law provision concerning liquidation survive the merger agreement approved by the requisite number of stockholders and approved by the Commission as just and reasonable. Any such rights are, as a matter of federal law, accorded recognition in the obligation of the Commission not to approve any plan which is not just and reasonable." *Id.*, at 200–201.

It is true that the effect of the *Schwabacher* decision was to extinguish whatever contractual rights the dissenting shareholders possessed as a matter of Michigan law. But the Court did require the ICC, on remand, to consider whatever value the Michigan law claims might have in connection with its final conclusion that the merger plan was "just and reasonable." A fair reading of the entire opinion makes it clear that the holding was based more on the ICC's "complete control of the capital structure to result from a merger," *id.*, at 195, than on the exemption at issue in these cases. *Schwabacher* cannot fairly be read as authorizing carriers to renounce private contracts that limit the benefits achievable through the merger.

### III

There is tension between the Court's interpretation of the exemption that is now codified in 49 U. S. C. § 11341(a) and the labor-protection conditions set forth in 49 U. S. C. § 11347. The latter section requires an ICC order approving a railroad merger to impose conditions that are "no less protective" of the employees than those established pursuant to the Rail Passenger Service Act, 84 Stat. 1337, as amended, 45 U. S. C. § 565. One of the conditions established by the Secretary of Labor under the latter Act was essentially the same as § 2 of the *New York Dock* conditions described by the Court, *ante*, at 120–121. As the Court notes, that condition provides that the benefits protected "'under applicable laws and/or existing collective bargaining agreements . . . shall be preserved unless changed by future collective bargaining agreements.'" *Id.*, at 121 (citation omitted). This provision unambiguously indicates that Congress intended and expected that collective-bargaining agreements would survive any ICC approved merger.

As I noted in my separate opinion in *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 298 (1987), the statutory immunity provision in § 11341 is self-executing and becomes effective at the time of the ICC approval. "The breadth of the exemption is defined by the scope of the approved transaction, and no explicit announcement of exemption is required to make the statute applicable." *Ibid.* (footnote omitted). In neither of the cases before the Court today did the ICC approval of the merger purport to modify or terminate any collective-bargaining agreement. The ICC approval orders were entered in 1980 and 1982 and contained no mention of either of the proposed transfers of personnel that are now at issue and about which the union was first notified several years after the ICC orders were entered.[8]

---

[8] In the ICC order approving the merger of Chessie System, Inc., and Seaboard Coastline Industries, Inc., the ICC discussed how the coordination of facilities would generate significant cost reductions and improved

I cannot subscribe to a late-blooming interpretation of a 71-year-old immunity statute that gives the Commission a roving power—exercisable years after a merger has been approved and consummated—to impair the obligations of private contracts that may "prevent the efficiencies of consolidation from being achieved." *Ante*, at 133. The Court's decision may represent a "better" policy choice than the one Congress actually made in 1920, cf. *West Virginia University Hospitals, Inc.* v. *Casey*, *ante*, at 100–101, but it is neither an accurate reading of the command that Congress issued in 1920, nor is it a just disposition of claims based on valid private contracts.

I respectfully dissent.

---

economic efficiency. *CSX Corp.—Control—Chessie System, Inc., and Seaboard Coastline Industries, Inc.*, 363 I. C. C. 521, 556 (1980). The ICC noted:

"These savings will spring from common-point coordination projects, mechanical and engineering department coordinations, locomotive and car utilization improvements, and internal rerouting efficiencies. Each of these projects is discussed separately below." *Ibid.*

In the discussion that followed, the ICC did discuss plans to expand the car production facilities at Raceland, Kentucky, in order to make cars for a member line that had been buying its cars from an independent manufacturer. The ICC found that the applicants had failed to show that the public would derive any benefit from this plan. There was no discussion of the consolidation of that facility by closing Seaboard's car repair shop in Waycross, Georgia. Nor did the ICC discuss the consolidation of locomotive works in *Norfolk Southern Corp.—Control—Norfolk & W. R. Co. and Southern R. Co.*, 366 I. C. C. 173 (1982).