114 F.3d 1242
 155 L.R.R.M. (BNA) 2549, 325 U.S.App.D.C. 34,
134 Lab.Cas. P 10,009
 UNITED TRANSPORTATION UNION, Petitioner,
v.
SURFACE TRANSPORTATION BOARD and United States of America, Respondents,
CSX Transportation, Inc., Intervenor.
RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Petitioners,
v.
SURFACE TRANSPORTATION BOARD and United States of America,
Respondents.
 Nos. 96-1201, 96-1202.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 11, 1997.
Decided June 13, 1997.
 
 On Petitions for Review of an Order of the Surface Transportation Board.
 Norton N. Newborn, for United Transportation Union, and John O'B. Clarke, Jr., for Railway Labor Executives' Association, et al., argued the cause for the petitioners. William G. Mahoney and Richard S. Edelman were on brief.
 Louis Mackall, V, Attorney, Surface Transportation Board, argued the cause for the respondents. Henri F. Rush, General Counsel, Surface Transportation Board, was on brief. John J. Powers, III, and Robert J. Wiggers, Attorneys, United States Department of Justice, entered appearances.
 Ronald M. Johnson argued the cause for intervenor CSX Transportation, Inc.
 Before SILBERMAN, WILLIAMS and HENDERSON, Circuit Judges.
 KAREN LeCRAFT HENDERSON, Circuit Judge:
 
 
 1
 The United Transportation Union (UTU) and the Railway Labor Executives' Association (RLEA) (together the Unions) petition for review of an order of the Surface Transportation Board (STB or Board)[1] concluding that a coordination of railway service sought by CSX Transportation, Inc. (CSXT) was to be carried out pursuant to the labor protective conditions imposed by the STB's New York Dock rules rather than pursuant to the Railway Labor Act (RLA), 45 U.S.C. §§ 151 et seq. The Unions contend that the STB lacked jurisdiction to enter its order and that even if the STB had jurisdiction its decision was arbitrary and capricious. We deny the petition for review.
 
 I.
 
 2
 In 1980 the Interstate Commerce Commission (ICC) authorized the CSX Corporation (CSX) to merge with the Chessie System Inc. (Chessie) and Seaboard Coast Line Industries, Inc. (SCLI) and thereby acquire control of the railroads that had been Chessie and SCLI subsidiaries. See CSX Corp.--Control--Chessie Sys., Inc. & Seaboard Coast Line Indus., Inc., 363 I.C.C. 521 (1980), aff'd sub nom. Brotherhood of Maintenance of Way Employees v. ICC, 698 F.2d 315 (7th Cir.1983), (CSX Control). As required by the Interstate Commerce Act (ICA or Act), 49 U.S.C. §§ 10101 et seq.,[2] the ICC conditioned its common control approval on CSX's compliance with conditions known as the New York Dock conditions, see New York Dock Ry.--Control--Brooklyn E. Dist., 360 I.C.C. 60, aff'd, 609 F.2d 83 (2d Cir.1979), designed to protect employees from any adverse effects of the merger. See CSX Control, 363 I.C.C. at 588.
 
 
 3
 Following CSX Control, additional mergers occurred whence CSXT, a subsidiary of CSX, ultimately emerged in 1987 as a single entity controlling the operations of, among others, the former Chesapeake & Ohio Railway Company(C&O), the Louisville & Nashville Railroad Company (L&N) and the Clinchfield Railroad Company (Clinchfield).[3] Notwithstanding the consolidations, work continued to be allocated as if the original entities retained their separate identities. For example, former C&O employees worked only sections of track formerly operated by C&O. Under CSX Control, the work allocation could be changed only by implementing a service coordination pursuant to the New York Dock rules. One such service coordination, implemented by negotiated agreement in 1981 (1981 Agreement), provided for coordinated operations over approximately 230 miles of track in southeastern Kentucky and western Virginia (Coordinated Territory) that had previously been separately operated by the C&O, the L&N and the Clinchfield.
 
 
 4
 In 1993 CSXT decided to implement a new coordination of train operations (1993 Proposed Coordination) involving the Coordinated Territory covered by the 1981 Agreement as well as additional track not subject to the 1981 Agreement. Pursuant to article 1, section 4 of the New York Dock conditions, CSXT notified UTU that it wished to negotiate a New York Dock implementing agreement to effect the expansion of the Coordinated Territory. UTU refused to negotiate on the ground that any modifications to the 1981 Agreement had to be negotiated pursuant to the RLA procedures rather than the New York Dock procedures.[4] Specifically, UTU relied on the following language of Article XVIII of the 1981 Agreement:
 
 
 5
 This Agreement shall remain in full force and effect until revised or modified in accordance with the Railway Labor Act, as amended.
 
 
 6
 JA 61. When the parties could not agree on the applicable procedures, they submitted the issue to arbitration. The arbitration panel concluded that, according to the terms of the 1981 Agreement, the RLA provided the applicable procedures for the 1993 Proposed Coordination. CSXT petitioned for review to the ICC. The STB, which by then had replaced the ICC, see supra n. 1, vacated the arbitration panel's decision and ordered the parties to negotiate--or arbitrate if necessary--an agreement implementing the 1993 Proposed Coordination using New York Dock procedures. CSX Corp.--Control--Chessie Sys., Inc. & Seaboard Coast Line Industries, Inc., Finance Docket No. 28905 (Sub-No. 26), 1996 WL 203539 (S.T.B. Apr. 15, 1996). The Unions then petitioned for review to this court.
 
 II.
 A. Jurisdiction
 
 7
 The Unions first argue that the STB lacked jurisdiction to enter its order vacating the arbitration panel's decision. They have, however, waived any jurisdictional argument. First, in its opposition to CSXT's petition to review the arbitration decision, UTU stated "it is appropriate for ICC to review the award." JA 228.[5] Moreover, the Unions concede they did not make a jurisdictional argument until this appeal. Pet'rs Joint Reply Br. at 3 ("[I]t is correct that Petitioners did not argue below that the STB did not have jurisdiction."). The Unions are therefore precluded from raising their jurisdictional argument now because "claims not presented to the agency may not be made for the first time to a reviewing court." United Transp. Union v. ICC, 43 F.3d 697, 701 (D.C.Cir.1995) (quoting Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680 (D.C.Cir.1983)). They attempt to avoid this result by arguing that, although the STB's jurisdiction over the specific issue raised by CSXT's petition for review was conceded, the STB in fact exceeded its authority and decided a different issue. The Unions claim that because the STB's unauthorized assertion of authority was not manifest until it rendered its decision, the Unions were free to petition this court for review and to challenge the Board's jurisdiction for the first time. Specifically, the Unions contend that, while the STB had jurisdiction to decide whether the parties had the power to agree that future implementation agreements would be governed by procedures other than the New York Dock rules, it was without jurisdiction to interpret Article XVIII of the 1981 Agreement. The latter question, the Unions contend, involves the interpretation of a collective bargaining agreement (i.e., the 1981 Agreement) and is therefore to be decided by the adjustment boards established under the RLA. 45 U.S.C. § 153.
 
 
 8
 The Unions' argument does not excuse their waiver because the question of the interpretation of Article XVIII was presented to the STB. CSXT's petition for review to the STB manifests that CSXT sought review of the arbitrators' conclusion that the 1981 Agreement "preclude[d] further coordinations unless the procedures of the Railway Labor Act ... were followed." JA 8. Thus CSXT presented not only the issue of whether the parties were authorized to substitute RLA procedures for New York Dock procedures but also whether the 1981 Agreement did in fact work such a substitution.
 
 
 9
 The Unions also suggest that because their claim involves "subject matter jurisdiction," Pet'rs Joint Reply Br. at 3, it can be raised at any time, just as a district court's subject matter jurisdiction can be raised at any time under Federal Rule of Civil Procedure 12(h)(3). Arguments as to agency jurisdiction, however, cannot be raised for the first time on appeal except in the very limited case, not presented here, where the challenge is to "the very composition or 'constitution' of an agency." Mitchell v. Christopher, 996 F.2d 375, 378 (D.C.Cir.1993).
 
 B. The Merits
 
 10
 The Unions argue that the STB's vacatur of the arbitration panel's decision was arbitrary and capricious. The scope of the STB's review of arbitration proceedings is set forth in the Board's Lace Curtain decision. See Chicago & N.W. Transp. Co.--Abandonment, 3 I.C.C.2d 729 (1987), aff'd sub nom. International Bhd. of Elec. Workers v. ICC, 862 F.2d 330 (D.C.Cir.1988). Under Lace Curtain, the STB reviews an arbitration if it involves "recurring or otherwise significant issues of general importance regarding the interpretation of ... labor protective provisions," id. at 736, and will vacate an arbitral award only if "there is egregious error, the award fails to draw its essence from the collective bargaining agreement, or the arbitrator exceeds the specific contract limits on his authority," id. at 735. The Unions' primary argument is that, because the plain language of Article XVIII of the 1981 Agreement makes RLA procedures applicable to the 1993 Proposed Coordination, the arbitrators could not have committed "egregious error" in finding those procedures applicable.
 
 
 11
 We disagree that the language of Article XVIII requires the application of RLA procedures to implement the 1993 Proposed Coordination. Article XVIII states:
 
 
 12
 This Agreement shall remain in full force and effect until revised or modified in accordance with the Railway Labor Act, as amended.
 
 
 13
 JA 61. Like the STB, we believe that the language is susceptible to alternative interpretations. It can be read, as the Unions contend, to mean that any revision or modification affecting the territory or the employees covered by the 1981 Agreement must be carried out in accordance with the RLA. But the language can also mean, as the STB contends, that the phrase "this Agreement" evidences the parties' intent to limit the scope of Article XVIII to the subject matter of the 1981 Agreement--the implementation of an ICC-approved transaction involving the coordination of a particular geographic area. A coordination involving a different geographic area, whether or not it overlaps with the Coordinated Territory, would not be subject to Article XVIII's mandate. Thus, for example, a change in pay rates for employees working in the Coordinated Territory would be subject to RLA procedures; a coordination of territories approved by the Board pursuant to former 49 U.S.C. § 11347 (now 49 U.S.C. § 11326), however, would remain subject to New York Dock rules notwithstanding that the coordination might alter pay rates established by the earlier implementation agreement. See1996 WL 203539, at * 7.
 
 
 14
 In view of the ambiguity, we think that the STB's interpretation of Article XVIII as inapplicable to transactions such as the 1993 Proposed Coordination is neither arbitrary nor capricious. While the ICA protects employee interests through the New York Dock rules, the Act also serves the public interest in ensuring that efficiency-promoting consolidations occur in a timely manner. For example, former 49 U.S.C. § 11341(a) (now 49 U.S.C. § 11321(a)) provided that once the ICC had approved a transaction, the parties participating in the approved transaction were "exempt from the antitrust laws and from all other law" to the extent necessary to carry out the transaction. In Norfolk & Western Railway Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the Supreme Court interpreted the "all other law" phrase in former section 11341(a) to include obligations imposed by a collective bargaining agreement. In balancing both the employees' interests and the public interest under the ICA, the Supreme Court emphasized that RLA procedures can be so time consuming that to require their use in transactions necessary to carry out ICC-approved consolidations[6] could very well defeat the efficiencies the consolidation is meant to achieve. Id. at 133, 111 S.Ct. at 1165-66 ("If § 11341(a) did not apply to bargaining agreements enforceable under the RLA, .... [t]he resolution process for major disputes under the RLA would so delay the proposed transfer of operations that any efficiencies the carriers sought would be defeated."). Accordingly, the Court concluded that once a consolidation is approved and the labor protective conditions of the Act are satisfied, the public interest requires that collective bargaining terms and RLA procedures be superseded if necessary to achieve consolidation. Id. While it remains unresolved whether the 1993 Proposed Coordination complies with the labor protective conditions of the ICA--at least until the parties sit down to negotiate pursuant to New York Dock--nevertheless, given the emphasis the Dispatchers decision places on expeditious consolidation, we think that the STB acted within its discretion in concluding that contracting parties wanting to replace New York Dock procedures with the more complex RLA procedures must make their intent plain.[7] Article XVIII of the 1981 Agreement fails to do so.
 
 
 15
 Finally, we note that in determining whether an arbitration decision constitutes "egregious error," the STB may properly consider the adverse impact the decision can have in light of other arbitration decisions. We take the STB to mean that the arbitrators' error is egregious not necessarily because of the quality of their reasoning but because of the impact of their decision on the STB's administration of the Act. For example, a different arbitration panel (in a case involving consolidation of seniority lists) construed collective bargaining agreement language nearly identical to that of Article XVIII and decided the language did not supersede New York Dock procedures; the STB subsequently affirmed that panel's decision.[8] At the time the STB reviewed this case, it had already decided the seniority consolidation case. It would not make sense to conclude that the STB's attempt to reconcile conflicting arbitration decisions and to interpret nearly identical contract language consistently constitutes an arbitrary and capricious decision.
 
 
 16
 For the foregoing reasons, the petition for review is denied.
 
 
 
 [1]
 The ICC Termination Act of 1995 (ICCTA), Pub.L. No. 104-88, 109 Stat. 803, abolished the Interstate Commerce Commission (ICC) and established the STB in its stead. Because this case involves events both before and after the enactment of ICCTA, we refer to the ICC or the STB as appropriate
 
 
 [2]
 Section 204 of the ICCTA provides that matters arising before January 1, 1996 are governed by the pre-ICCTA version of the ICA. The ICA provision applicable here, therefore, is former 49 U.S.C. § 11347, identical in all material respects to current 49 U.S.C. § 11326
 
 
 [3]
 The C&O was formerly controlled by Chessie. The L&N and the Clinchfield were formerly controlled by SCLI. CSXT also came to control five other former subsidiaries of Chessie and eight other former subsidiaries of SCLI. The Board's decision below sets out the history of the emergence of CSXT in greater detail. CSX Corp.--Control--Chessie Sys., Inc. & Seaboard Coast Line Indus., Inc., Finance Docket No. 28905 (Sub-No. 26), 1996 WL 203539, at * 2 (S.T.B. Apr. 15, 1996)
 
 
 [4]
 Dispute resolution procedures under the RLA are less expeditious than those under New York Dock. In the words of the Supreme Court, "The RLA subjects all railway disputes to virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation.' " Burlington N. R.R. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 444, 107 S.Ct. 1841, 1850, 95 L.Ed.2d 381 (1987) (quoting Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 148-49, 90 S.Ct. 294, 298-99, 24 L.Ed.2d 325 (1969)). New York Dock by contrast calls for a limited period of negotiation followed by binding arbitration if necessary. See 360 I.C.C. at 71 ("We note here that article I, section 4, embodies a highly structured plan with specified time limits for notice, negotiation, arbitration, and decision.")
 
 
 [5]
 RLEA, an intervenor in the proceedings before the Board, filed its own opposition to CSXT's petition for review. Although RLEA did not expressly acknowledge the Board's jurisdiction as UTU did, neither did it challenge the Board's jurisdiction. JA 213-19
 
 
 [6]
 A coordination of services, such as the 1993 Proposed Coordination, is an example of a transaction necessary to carry out a consolidation. Indeed, Dispatchers involved, inter alia, a coordination of services implemented by CSX to carry out the consolidation authorized in CSX Control. See 499 U.S. at 123-24, 111 S.Ct. at 1160-61
 
 
 [7]
 This case does not present a genuine Dispatchers issue. That is, because we affirm the STB's determination that Article XVIII by its terms does not require the use of RLA procedures, we need not address whether it would be appropriate under Dispatchers, assuming the parties intended to make the RLA applicable, to override their intention because "necessary" to complete the transaction. See Dispatchers, 499 U.S. at 133, 111 S.Ct. at 1165-66. Another unresolved Dispatchers issue is whether the public interest in consolidation is so great that parties may never replace New York Dock procedures with RLA procedures. The STB assumed without deciding that the parties retain the power. We express no opinion on the issue
 
 
 [8]
 We recently affirmed the STB. United Transp. Union v. STB, 108 F.3d 1425 (D.C.Cir.1997). The Unions also claim that the STB arbitrarily and capriciously gave inconsistent interpretations to the "rights, privileges and benefits" language of section 2 of New York Dock here and in the earlier case. As the STB points out, however, it has yet to interpret substantively the New York Dock conditions in this case. The case has not yet reached that point because of the arbitration decision declaring New York Dock inapplicable to the 1993 Proposed Coordination