**ALABAMA POWER COMPANY, et al., Plaintiffs,**

v.

**TENNESSEE VALLEY AUTHORITY, et al., Defendants.**

**No. CV 96–PT–0097–S.**

United States District Court, N.D. Alabama, Southern Division.

Aug. 28, 1996.

Rodney O. Mundy, Alan T. Rogers, Michael D. Freeman, Lyle D. Larson, Teresa G. Minor & Karl R. Moor, Balch & Bingham, Birmingham, AL, Robert H. Forry, Troutman Sanders, Atlanta, GA, Ben H. Stone & Scott E. Andress, Eaton & Cottrell P.A., Gulfport, MS, for plaintiffs.

Edward S. Christenbury, Robert B. Glinski, Harriet Cooper, James E. Fox & Thomas C. Doolan, Tennessee Valley Authority, Knoxville, TN, N. Lee Cooper & Cathy S. Wright, Birmingham, AL, Dorothy E. O'Brien & John McCall, Louisville Gas & Electric, Louisville, KY, for defendants.

## MEMORANDUM OPINION

PROPST, Senior District Judge.

This cause comes on to be heard on Defendant Tennessee Valley Authority's Motion To Dismiss Or, In The Alternative, For Summary Judgment filed on March 18, 1996; Power Companies' Motion For Summary Judgment filed on April 15, 1996; and the Motion of LG & E Power Marketing, Inc. For Summary Judgment filed on April 30, 1996. At a recorded conference on June 4, 1996, all the parties acknowledged that the cause is appropriate for determination, one way or the other, on motion(s) for summary judgment. The parties acknowledge that the issues are issues of law related to the interpretation of controlling statutory provisions. The issues are either unbelievably simple or extremely complex. In any event, this court is likely serving only as a conduit to the appellate process.

The plaintiffs have filed a statement of purported material facts which they say are not in dispute. The defendant(s) have responded to that list and agree in most respects. In other respects they agree, but with clarifications, argument, and/or extrapolations. In some respects, there are denials that the alleged facts are material. In a very few instances, there are outright denials. In any event, the parties agree that there are no factual disputes sufficient to defeat at least one of the motions for summary judgment.

### Pertinent Statutory Provisions

Of course, the readers will be generally familiar with the Tennessee Valley Authority ("TVA"). It was established under the provisions of the Tennessee Valley Authority Act of 1933. See 16 U.S.C. § 831, *et seq.* TVA was created in the "interest of the national defense and for agricultural and industrial development, and to improve navigation in the Tennessee River and to control the destructive flood waters in the Tennessee River and Mississippi River Basins." 16 U.S.C. § 831. TVA's Board of Directors ("Board") "is directed in the operation of any dam or reservoir in its possession and control to regulate the stream flow *primarily* for the purposes of promoting navigation and controlling floods" (emphasis added). 16 U.S.C. § 831h–1. So far as may be *consistent with such purposes,* the Board is authorized to provide and operate facilities for the generation of electric energy in order to avoid the waste of water power, to transmit and market such power "as in this chapter provided," and thereby, so far as may be practicable, to assist in liquidating the cost or aid in the

maintenance of the projects of TVA. *Id.* Title 16 U.S.C. § 831i authorizes the Board to sell surplus power to all types of entities, but with preference to governmental entities and non-profit cooperative organizations. For a general discussion of the sale of surplus power by TVA, see *Tennessee Valley Authority v. Ashwander,* 78 F.2d 578 (5th Cir.1935), aff'd, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), reh'g denied, 297 U.S. 728, 56 S.Ct. 588, 80 L.Ed. 1011 (1936).[1]

16 U.S.C. § 831j provides:

It is declared to be the policy of the Government so far as practical to distribute and sell the surplus power generated at Muscle Shoals *equitably among the States, counties, and municipalities within transmission distance.* This policy is further declared to be that the projects herein provided for shall be considered primarily as for the *benefit of the people of the section* as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, and accordingly that *sale to and use by industry shall be a secondary purpose,* to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity.... (emphasis added).

The parties agree that, in addition to the pertinent provisions of 16 U.S.C. § 831n–4, hereinafter discussed, the provisions of 16 U.S.C. § 831k may have special pertinence in this case. That section provides, *inter alia,* that:

And provided further, That as to any surplus power not so sold as above provided to States, counties, municipalities, or other said organizations, *before the board shall sell the same to any person or corporation engaged in the distribution and resale of* electricity for profit, it shall require said person or corporation to agree that any resale of such electric power by said person or corporation shall be made to the ultimate consumer of such electric power at prices that shall not exceed a schedule fixed by the board from time to time as reasonable, just, and fair; and in case of any such sale, if an amount is charged the ultimate consumer which is in excess of the price so deemed to be just, reasonable, and fair by the board, the contract for such sale between the board and such distributor of electricity shall be voidable at the election of the board: *And provided further,* That the board is authorized to enter into *contracts with other power systems for the mutual exchange* of unused excess power upon suitable terms, for the conservation of stored water, and as an emergency or break-down relief. (emphasis added).[2]

In 1959, as part of an enactment authorizing TVA to issue and sell bonds, Congress, as an apparent *quid pro quo,* included in 16 U.S.C. § 831n–4 the following provisions:

*Unless otherwise specifically authorized by Act of Congress* the Corporation shall make no contracts *for the sale or delivery of power* which would have the effect of making the Corporation or its distributors, *directly or indirectly, a source of power supply outside the area for which the Corporation or its distributors were the primary source of power supply on July 1, 1957,* and such additional area extending not more than five miles around the periphery of such area as may be necessary to care for the growth of the Corporation and its distributors within said area: *Provided, however,* That such additional area shall not in any event increase by more than 2½ per centum (or two thousand square miles, whichever is the lesser) the area for which the Corporation and its

---

1. The statutory provisions now at issue place a limitation on the authority of TVA to dispose of power recognized in *Ashwander.* At the time *Ashwander* was decided, TVA could apparently sell surplus power to anyone at any place.

2. It would appear that § 831k provides for the *sale* of surplus power to for profit companies if its resale is governed by prices established by TVA and that it *also* separately provides for contracts for the *exchange* of unused excess power with other power systems. If "exchange" is synonymous with "sell," the second proviso would appear to be redundant.

distributors were the primary source of power supply on July 1, 1957: *And provided further,* That no part of such additional area may be in a State not now served by the Corporation or its distributors or in a municipality receiving electric service from another source on or after July 1, 1957, and no more than five hundred square miles of such additional area may be in any one State now served by the Corporation or its distributors.

Nothing in this subsection shall prevent the Corporation or its distributors from supplying electric power to any customer within any area in which the Corporation or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act.

Nothing in this subsection shall prevent the Corporation, when economically feasible, *from making exchange power arrangements with other power-generating organizations with which the Corporation had such arrangements on July 1, 1957. . . .* (emphasis added).[3]

There follow provisions authorizing TVA to supply power to various named towns or cities in Tennessee, Kentucky, and Georgia, a named air station in Mississippi and other federal agencies. The enactment concludes with a statement of Congressional declaration of intent:

It is declared to be the intent of this section to aid the Corporation in discharging its *responsibility for the advancement of the national defense and the physical, social and economic development of the area in which it conducts its operations* by providing it with adequate authority and administrative flexibility to obtain the necessary funds with which to assure an ample supply of electric power for such purposes by issuance of bonds and as otherwise provided herein, and this section shall be construed to effectuate such intent. (emphasis added).

Defendants note that 16 U.S.C. § 831dd provides that,

This chapter shall be liberally construed to carry out the purposes of Congress to provide for the disposition of and make needful rules and regulations respecting Government properties entrusted to the Authority, provide for the national defense, improve navigation, control destructive floods, and promote interstate commerce and the general welfare. . . .

The court notes that there is no specific reference in this section to the sale or exchange of power outside of the defined area. The question arises as to what purposes of Congress are to be served by liberal construction? TVA suggests that the purposes to be served are the purposes for which TVA was created by Congress.[4] In *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 7, 88 S.Ct. 651, 655, 19 L.Ed.2d 787 (1968), the Court stated, "[I]t is clear and undisputed that the protection of private utilities from TVA competition was almost universally regarded as the primary objective of the [1959] limitation [in § 831n–4]."[5]

### Facts

The court will not specifically repeat all the facts as alleged by plaintiffs and as responded to by defendants. The court will state some of the pertinent facts. Some facts were agreed to as discussed above and others were agreed to during the June 4, 1996 recorded conference.[6]

Among the pertinent facts are the following: The plaintiffs and Louisville Gas and Electric Company ("LG & E") were and are

---

**3.** Note that as in § 831k, which is quoted in part above, there are separate provisions for *sales* and *exchanges.* The term "power generating organizations" is used rather than "power systems."

**4.** The purposes were apparently not primarily the sale of power outside the "section."

**5.** See *Hardin* for a history of the circumstances leading to the adoption of the 1959 Act.

**6.** While the court has considered extensive quotes from legislative history and various affidavits, it will not quote therefrom in this opinion. The legislative history suggests that Congress was concerned about extending the area of TVA competition with private companies. Some of the affidavits suggest that both TVA and its experts have heretofore been aware that the 1959 Act likely restricts its ability to enter into such contracts as the LPM contract.

among the "other power-generating organizations" with which TVA had "exchange power arrangements" on July 1, 1957. During 1989–1990, LG & E Energy Corp. ("Energy Corp."), a Kentucky corporation, was formed as a holding company under an arrangement whereby LG & E became a subsidiary of Energy Corp. As the result of a mandatory share exchange, the common stockholders of LG & E became the common stockholders of Energy Corp., and Energy Corp. became the sole common stockholder of LG & E. The reasons for the restructuring given in a "Proxy Statement" contained in Amendment No. One to Form S–4 Registration Statement filed with the Securities and Exchange Commission on April 9, 1990 included that "the holding company will provide the structure and flexibility needed to take advantage of opportunities *in other related businesses* that will enhance stockholder value. The holding company structure will also contribute to the economic development of [LG & E's] service area and provide a *separation* among [LG & E] and other businesses to *insulate* utility customers from those other businesses." (emphasis added). The Proxy Statement also states that, "The holding company structure will give [Energy Corporation] the flexibility to take advantage of opportunities *to develop or acquire other businesses,* thereby providing opportunities for increased earnings." (emphasis added). Further:

Although [LG & E] presently has not identified any significant investment activities for [Energy Corp.], it is expected that [Energy Corp.] will only develop or acquire other businesses which are closely related to [LG & E's] core business of providing electric and gas service. *These investments will offer the opportunity for greater earnings growth and mitigate the limitations of being a regulated electric and gas utility.*

The holding company structure, by segregating the new businesses into corporations *that will not be subsidiaries of [LG & E], will provide the flexibility needed to achieve successful assimilation of new businesses.* Since the *new businesses* of [Energy Corp.] will be conducted through *separate* subsidiaries of [Energy Corp.] and not of [LG & E], *any benefits or*

*detriments that result from the restructuring and consequent segregation of [LG & E] and the other businesses will flow primarily to the security holders of [Energy Corp.] and not to [LG & E's] customers or owners of [LG & E's] preferred stock and debt securities.*

The holding company structure will enhance the flexibility of [LG & E] to adjust to increased competition. For instance, if the current efforts of Federal agencies to increase competition and reduce regulation are successful, it is reasonable to expect that the risk associated with electric and gas utilities such as [LG & E] will increase. However, through the *development of new businesses,* [Energy Corp.] will be able to expand its sources of income. The expanded income base should assist [LG & E's] financial stability.

Besides benefiting stockholders, [LG & E] believes the creation of the holding company structure will produce future benefits for [LG & E's] utility customers and the Commonwealth of Kentucky in general. *Direct investment opportunities are expected to be available to [Energy Corporation] within and outside of [LG & E's] service area.* An infusion of new capital into the service area should lead to additional jobs, a strengthened economy and an increase in sales of gas and electricity within the service territory, which in turn will directly benefit [LG & E], its stockholders and customers. (emphasis added).

Further,

*The new holding company structure will provide clear delineation of regulatory jurisdictions. As a subsidiary of [Energy Corp.], [LG & E] will continue to be the same electric and gas utility it is today, serving Louisville and surrounding areas and regulated by the Kentucky Commission and the Federal Energy Regulatory Commission ("FERC").* LG & E Energy, as the non-utility parent corporation, will not be directly regulated by the Kentucky Commission or the FERC. Transactions and contracts between [LG & E] and [Energy Corp.] will be subject to review by the Kentucky Commission and possibly

other regulatory bodies. (emphasis added).

*Under the Holding Company Act and current SEC policies, there are also limitations on the extent to which [Energy Corp.] could expand the utility business of [LG & E] (either directly or through a subsidiary) outside of Kentucky.* (emphasis added).

In addition, [LG & E] agreed to establish guidelines regulating intercompany transactions, *whereby distinct and separate accounting and financial records* will be maintained and fully documented for each entity within the holding company system. This will enable [LG & E], among other things, to *maintain a separation of costs between [LG & E] and the new businesses.* The structure of intercompany transactions also will be regulated pursuant to these guidelines to ensure that *the new businesses* are not subsidized by [LG & E] and its customers. Accordingly, transfers or sales of assets from [LG & E] to [Energy Corp.] or other subsidiaries generally would be priced under the guidelines at the greater of cost or fair market value, while transfers or sales of assets to [LG & E] from [Energy Corp.] or other subsidiaries generally would be priced at the lower of cost or fair market value. (emphasis added).

The Directors of [LG & E] Company are expected to become the Directors of [Energy Corp.] upon consummation of the Restructuring. In the future, however, [LG & E] and [Energy Corp.] may have different directors.

An "Application For An Order In Connection With Corporate Reorganization" filed by LG & E with the Federal Energy Regulation Commission on December 19, 1989, contains, *inter alia,* the following language:

With one exception, *the proposed reorganization will not affect any contract for the purchase, sale or interchange of electric energy and all such contracts that are in existence on the date of the reorganization will continue in effect in accordance with their terms after the reorganization.*

The one exception is that the agreement between Ohio Valley and LG & E regarding services to be rendered by Ohio Valley for LG & E will cease to be in effect following the Merger. (emphasis added).

With the exception of payment to holders of LG & E's common stock or $25 Preferred Stock who dissent to the Exchange, *there will be no change in the capital structure of LG & E.* The Holding Company will own all of the common stock of LG & E. LG & E's debt obligations and preferred stock (other than the holders of the $25 Preferred Stock who dissent) will continue to be the obligations of LG & E.

Transactions between LG & E, the Holding Company and any non-utility subsidiary that may be created will be governed by the following policies:

I.  A distinct separation of costs between utility and non-utility activities will be maintained.

II. Intercompany transactions will be structured to ensure that non-utility activities are not subsidized by LG & E and its customers.

III. Strict internal controls will be maintained to provide reasonable assurance that intercompany transactions are accounted for in accordance with management's policies and guidelines.

IV. All books and records of the Holding Company and all subsidiaries (including LG & E) will be maintained in accordance with Generally Accepted Accounting Principles and, in addition, the books and records of LG & E will continue to comply with the requirements of the Uniform System of Accounts. (emphasis added).

The Holding Company, as the new parent company of LG & E, plans from time

to time through subsidiaries to invest in non-utility businesses in which LG & E has expertise. Although LG & E presently has not identified any investment activities for the Holding Company, it is expected that the Holding Company will only develop or acquire other businesses which are closely related to LG & E's core business of providing gas and electric service. *These investments in non-utility businesses will offer the opportunity for greater earnings growth and mitigate the limitations attendant to being solely an electric and gas supplier in a defined service area with limited opportunity for growth.* (emphasis added).

.     .     .     .     .

The Holding Company structure, by segregating the non-utility businesses into corporations that will not be subsidiaries of LG & E, will provide the flexibility needed to achieve successful assimilation of new businesses and, at the same time, *will insulate the customers of LG & E and the holders of LG & E's public securities from the risks of the non-utility businesses.* Since unregulated businesses of the Holding Company will be conducted through separate subsidiaries of the Holding Company and not of LG & E, any liabilities incurred by those subsidiaries will not constitute liabilities of LG & E. *Similarly, the preferred shareholders and debt security holders of LG·& E after the restructuring will be insulated from the risks of the unregulated businesses.* Any benefits or detriments that result from the restructuring and consequent segregation of LG & E and the unregulated ·businesses will flow primarily to the security holders of the Holding Company and not to the owners of LG & E's preferred stock and debt securities.

The Holding Company structure will enhance the flexibility of LG & E to adjust to increased competition. For instance, if the current efforts of Federal agencies to increase competition and reduce regulation are successful, it is reasonable to expect that the risk associated with electric utilities such as LG & E will most likely increase. *However, through the develop-*

*ment of non-utility subsidiaries, the Holding Company will be able to diversify its sources of income.* This diversified income base provided by the Holding Company should mitigate the potential adverse impact on LG & E's financial stability. (emphasis added).

.     .     .     .     .

The Holding Company structure provides clear delineation of regulatory jurisdictions. *As a subsidiary of the Holding Company, LG & E will continue to be the same electric and gas utility it is today, serving Louisville and surrounding areas and regulated by the Kentucky commission and the FERC.* (emphasis added).

.     .     .     .     .

The Holding Company, as the non-utility parent corporation, will not be regulated by the Kentucky Commission, the Indiana Commission or the FERC. The regulation of OVEC and other affiliated companies will not be affected by the proposed transaction.

In another application filed with the Public Service Commission of Kentucky, LG & E stated, *inter alia,*

In addition to overseeing the operations of LG & E, Holding Company will seek out investment opportunities for economic development. Holding Company, through subsidiaries, will seek to invest in businesses in LG & E's service territory in order to enhance the economy and employment in LG & E's service area and Kentucky in general. *Holding Company will also consider investment opportunities in other areas if they are consistent with its corporate objectives and would enhance shareholder value.* (emphasis added).

.     .     .     .     .

Holding Company, as the new parent company of LG & E, plans from time to time through subsidiaries to invest in non-utility businesses in which LG & E has expertise. Although LG & E presently has not identified any investment activities for Holding Company, it is expected that Holding Company will only develop or acquire other businesses which are closely

related to LG & E's core business of providing gas and electric service. *These investments in non-utility businesses will offer the opportunity for greater earnings growth and mitigate the limitations attendant to being solely an electric and gas supplier in a defined service area with limited opportunity for growth.* (emphasis added).

. . . . .

*The Holding Company structure provides clear delineation of regulatory jurisdictions.* As a subsidiary of Holding Company, *LG & E will continue to be the same electric and gas utility it is today,* serving Louisville and surrounding areas and regulated by the Commission and the FERC. Holding Company, as the non-utility parent corporation, will not be regulated by the Commission, the Indiana Commission or the FERC. (emphasis added).

. . . . .

The Holding Company structure will protect and safeguard the customers of LG & E and the public holders of LG & E's securities from any risks which may be associated with non-utility businesses. The unregulated businesses of Holding Company will be *conducted through separate subsidiaries and any liabilities incurred by those subsidiaries will not constitute liabilities of LG & E.* Similarly, the preferred shareholders and debt security holders of LG & E will be insulated from the risks of the unregulated businesses after the restructuring.

The corporate separation will ensure that all costs of a particular business will be charged to that business and not allocated to LG & E. To further ensure elimination of any potential for cross-subsidization of the various subsidiaries of Holding Company, LG & E will adopt and implement policies and guidelines on intercompany transactions. (emphasis added).

Form U–3A–2 filed with the Securities and Exchange Commission on February 21, 1996, includes the following statements:

*LG & E Power Marketing, Inc.—LG & E Power Marketing, Inc. (Power Marketing) is a California corporation with its principal executive offices located at 12500 Fair Lakes Circle, Fairfax, Virginia 22023.* Power Marketing received EWG status on April 19, 1994. Power Marketing owns a 50% interest in LG & E Power 15 Incorporated, which is a 50% owner of LG & E–Westmoreland Rensselaer, a general partnership which owns a 79 megawatt gas-fired combined cycle qualifying cogeneration facility located in Rennselaer, New York (Rensselaer), at 39 Riverside Avenue, Rennselaer, New York 12144. Power Marketing therefore owns a 25% interest in Rensselaer. Rensselaer, which received qualifying facility status in 1991 and was recertified in 1993, sells power exclusively at wholesale to Niagara Mohawk Power Corporation under a long term power purchase agreement executed in December 1987. Rensselaer obtained EWG status on March 2, 1995. Power Marketing is engaged directly and exclusively in the business of owning a part of Rensselaer, and selling at wholesale electric energy provided by Rensselaer and other sources not owned by Power Marketing (emphasis added).

. . . . .

*Power Marketing*—The following contracts exist between Power Marketing and system companies:

(a) In May 1994, Power Marketing entered into an Electricity Brokerage Agreement and a Dispatching Services Agreement with the Company's public utility subsidiary, LG & E. Under the terms of the Electricity Brokerage Agreement, Power Marketing is obligated to use its reasonable best efforts to broker excess power generated by LG & E for off-system sales and broker power LG & E desires to purchase, for no charge, at such times as LG & E requests such services. However, LG & E has no obligation under the Agreement to permit Power Marketing to broker its power.

(b) Under the terms of the Dispatching Services Agreement (which was amended in November 1995), LG & E performs, on a nonexclusive basis, power dispatching and scheduling services, short-term marketing, accounting of power movement and

transmission coordination service for the benefit of Power Marketing. LG & E is not obligated to secure generators, purchasers or sellers of power, or to perform any wheeling or transmission services for Power Marketing. LG & E's obligation to provide the above-mentioned services is also qualified by 1) its prior right to use its facilities to serve its native-load customers or other persons or entities pursuant to any agreements existing prior to the execution of the Dispatching Services Agreement, 2) any capacity restraints imposed on its dispatching facilities, and 3) regulatory impediments. Further, LG & E has no obligation to expand its existing facilities to perform the services described above, and the non-exclusive nature of the agreement permits LG & E to provide similar services for any other persons or entities. Power Marketing pays a fee for such services based upon a formula designed to ensure that LG & E is reimbursed its cost of providing the services, plus 10%. However, this fee calculation is based on Power Marketing's gross margins in the case of Tennessee Valley Authority power that is purchased and resold by Power Marketing.

(c) Power Marketing and LG & E entered into a Coal Contract Administration Agreement, dated December 15, 1995 (the "Agreement"), under which LG & E negotiates and administers a coal contract between Ohio Edison Company and Power Marketing ("Coal Contract") and a Coal Transportation Contract between Crounse Corporation and Power Marketing. Under the Agreement, LG & E negotiates coal contracts, reviews invoices, arranges for payments to be made to the supplier under the Coal Contract, schedules loading and barge handling, delivers coal and coor-

dinates the sampling of coal (the "Services"). In consideration for the Services, Power Marketing pays to LG & E a fee equal to (i) the sum of all "Direct Costs" incurred by LG & E during each calendar month of the contract term, multiplied by 110%, plus (ii) all "Third Party Charges" incurred by LG & E during such calendar month reimbursed at cost. The Agreement expires on December 31, 1996.

(d) Various departments within LPI, including Legal and Finance, perform services for Power Marketing from time to time on a time and materials reimbursement basis for selected tasks which are not provided pursuant to the agreements described above.

## Issues

The issues in this case are relatively simple to state, but, perhaps, not so easy of resolution. They are:

■ 1. Is LPM, by virtue of its status as an affiliate of LG & E, a "power generating [organization] with which [TVA]" had "exchange power arrangements" on July 1, 1957? [7]

2. If the answer to question 1 is "no," do plaintiffs automatically prevail?

3. Would re-sales of TVA power such as are made by LPM violate § 15d even if made by LG & E after purchases of power by LG & E from TVA? In other words, are there limits on the re-sale authority of the subject July 1, 1957 "power generating organizations," and are these limits imposed on TVA and such organizations?

4. Do plaintiffs have standing to bring this action?

7. LPM being created by Energy Corporation which itself resulted totally from a reorganization of LG & E. Question 1 has sub-parts as follows:
    a. Is LPM itself a "power generating organization?"
    b. In any event, is it a power generating organization with which TVA had arrangements on July 1, 1957?
    c. Even though it is a separate corporate entity, does its tie in to and arrangements with LG &

E make it or the combination of the two a power generating organization with which TVA had an arrangement on July 1, 1957?

The court concludes that the fact that LPM owns an interest in a power generating facility which is a separate entity as a stockholder or otherwise is immaterial. LG & E *is* such an organization and LPM's eligibility to purchase must be solely determined by its relationship with LG & E.

5.  What deference, if any, is to be given to TVA's decision to contract with LPM?

6.  How is the tension created in *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968) between the holding that the purpose of the 1959 Act is to "protect private utilities from TVA competition" and the holding that courts should take TVA's "determinations as their starting points," to be resolved?

### Standing

■ After considering *Hardin* and evidence of the sales which LPM is making, the court concludes that the plaintiffs have standing. They clearly fall within the category of private utilities which the 1959 Act was intended to protect. Px. 69 indicates that TVA's sales to LPM have substantially exceeded historical sales by TVA to LG & E. LPM's sales are apparently nationwide. In brief, LPM argues that, "The competition with which the plaintiffs are concerned and their reason for bringing this lawsuit is not competition from TVA. Rather, the plaintiffs are concerned with competition from LPM. This is not the competitive issue addressed in the TVA Act...." The court cannot accept this argument. Further, the court cannot accept LPM's argument that, "[T]he competition from LPM that the plaintiffs seek to prevent cannot confer on these plaintiffs standing to bring this law suit." Ignoring the "directly or indirectly" language of the Act, LPM argues that Congress sought only "to protect neighboring utilities from direct competition by TVA." Nor can the court accept LPM's argument that,

> In this case, plaintiffs have no standing to challenge the contract between LPM and TVA, because plaintiffs are strangers to that contract and the competitive interest that Congress sought to protect when it enacted Section 15d(a) is not the same as

the interest plaintiffs seek to protect in this lawsuit.

TVA makes an interesting argument with regard to the "standing" issue. The argument is that:

(1) There was no territorial limitation whatsoever on TVA's exchange power arrangements with designated entities, or on the resale of such power.[8]

(2) LPM is one of the exchange power purchasers contemplated by Congress.

(3) The main purpose of the area limitation in the 1959 amendment was to prevent TVA from expanding its territory and invading the service area of the investor-owned utilities.[9]

(4) The exchange power provision thus is not concerned with competitive injury.[10]

(5) "Hence, plaintiffs' alleged injury is a type of competition which section 15d does not address, and against which it could not have been intended to protect. It is thus not within the zone of the interests of the applicable statute, and is not sufficient for purposes of standing." TVA acknowledges that TVA's Board did not, before giving approval for TVA to enter into the agreement with LPM, determine that sales under the contract would not result in competition with plaintiffs.

■ The court cannot accept TVA's argument. If that argument were accepted, TVA could sell power to any power marketer, affiliated or not, which competes with plaintiffs and plaintiffs would not have standing. The court also cannot accept the argument that, in order to establish standing, plaintiffs must prove that the LPM power which competes with them is or was specifically TVA power. Power is fungible and cannot be so

---

**8.** As indicated, the court does not reach this issue.

**9.** This argument flies in the face of the prohibition against the sale or delivery of power which would have the effect of making TVA "directly or indirectly, a source of power outside the area...."

**10.** Perhaps not, but the sale or delivery of power having the effect of making TVA a source of power outside the defined area is a concern. Again, the court notes the statutory scheme which, throughout, distinguishes between general sales of power and exchanges of power with power generating organizations, which may, in some instances, take the form of sales and purchases.

easily identified.[11] TVA's standing argument is effectively this, "[T]he area limitation does not apply to exchange power arrangements." TVA's sales to LPM *are* exchange power limitations within the contemplation of the exception clause. Thus, there is no standing. That circular argument goes to the merits, not to standing. It is the bottom-line issue in the case. The court concludes that plaintiffs have standing to bring this action. The court notes that the defendants did not discuss standing in their initial briefs nor until the court raised the question.

### Discussion of Merits

While this court has waded and weeded through numerous arguments and counter arguments, it is convinced that there is really only one significant threshold issue. That is, did the 1959 Act's statutory exception or exemption for power generating organizations with which TVA had exchange power arrangements on July 1, 1957 contemplate and provide that a later organized separate affiliate under the umbrella of a later organized holding company which also owns all the capital stock of one of the July 1, 1957 eligible organizations be considered such a 1957 "organization." The court agrees with the parties that the statutory language, with a possible overlay of legislative history consideration, is controlling.

### Deference to TVA?

■ *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1 (1968), sheds the only controlling light on the issue. Its determination that "it is clear and undisputed that protection of private utilities from TVA competition was almost universally regarded as the primary objective of the [territorial limitation in § 15d of the 1959 Act]" renders moot the consideration of any arguable legislative his-

tory to the contrary. See *Hardin*, 390 U.S. at 7, 88 S.Ct. at 655. Matched against the foregoing holding in *Hardin* is its holding that at least certain determinations of the TVA Board are "entitled to acceptance unless [they lie] outside the range of permissible choices contemplated by the statute." *Id.* at 8, 88 S.Ct. at 656. Based upon the "innate and inevitable vagueness of the 'area' concept", at issue in *Hardin*, and the "complexity of the factors relevant to decision in this matter," the Court concluded that "it is more efficient, and thus more in line with the overall purposes of the Act, for the courts to take TVA's 'area' determinations as their starting points and to set these determinations aside only when they lack reasonable support in relation to the statutory purpose of controlling, but not altogether prohibiting, territorial expansion." *Id.* at 9, 88 S.Ct. at 656. Further matched against this latter holding is the specific language in the statute now under consideration that, "Unless *specifically authorized by Act of Congress* [TVA] shall make no contract for the sale or delivery of power which would have the effect of making [TVA] or its distributors, *directly or indirectly*, a *source* of power supply outside the area for which [TVA] or its distributors were the *primary source* of power supply on July 1, 1957 . . . ." (emphasis added). In this court's judgment, this statutory provision negates the defendants' argument that the court should give consideration to the alleged fact that Congress has been aware of similar purchases and sales and has failed to act to prohibit same.[12] The statutory provision does not necessarily conflict with the holding in *Hardin* that TVA determinations are to be given deference when there is an "innate and inevitable vagueness" in statutory terms. This raises, however, the further question of whether it is appropriate for TVA to not only

**11.** TVA acknowledges that the plaintiffs "are major participants in the wholesale power market." Further, that LPM competes in said market and that both LPM and plaintiffs have the authority to compete in the wholesale market throughout the United States. Further, that "[W]ith the enactment of the Energy Policy Act by Congress and the promulgation of open access regulations by [FERC], that market has grown increasingly competitive." Perhaps, as a matter of policy, plaintiffs should have to compete against LPM's

power supplied by TVA. The issue, however, is whether such policy concerns are to be decided by TVA or this court, or "specifically [addressed] by Congress." The 1959 amendment makes no distinction between wholesale and retail competition.

**12.** The court does not reach the issue of whether defendants' arguments in this regard have a basis in fact.

determine vague "area" issues, but also to determine which "organizations" are "power-generating organizations with which [TVA] had [exchange power] arrangements on July 1, 1957."

It should be noted that the "area" term being considered in *Hardin* was a term used in the *initial* limiting provision of § 15d.[13] It is certainly reasonably arguable that whether an "area" includes a total county or only villages within the county is a more vague concept than whether an entity is an "organization" with which TVA had an arrangement on July 1, 1957. This is particularly true when one term is in the initial limiting language and the other is in a "grandfathered" exception. One addresses a vaguely defined geographical area. The other addresses whether an organization with which TVA now has a contract did or did not exist in 1957; whether that organization is or is not a "power-generating organization"; and whether the contract is an "exchange power arrangement."

It should be noted that the *Hardin* majority apparently considered legislative history suggesting that at least one purpose of Congress was to "authorize adjustments and permit a certain amount of elasticity in the availability of TVA service." *Id.* at 11, 88 S.Ct. at 657. Further, the Court concluded that, "Under those circumstances, the TVA Board could properly have concluded that the pattern of electric power distribution would be more sensible and efficient if TVA competed in the *entire* Tazewell municipal area as well as serving the relatively unprofitable rural customers, many of whom were *rather close* to respondent's transmission line into the Tazewells". *Id.* at 12, 88 S.Ct. at 658.

While Justice Harlan, in his dissent, made a highly cogent argument concerning the Court's deference to TVA's statutory con-

struction, the majority apparently rejected his argument that, "The role of the courts should, in particular, be viewed hospitably where, as here, the question sought to be reviewed does not significantly engage the agency's expertise." *Id.* at 14, 88 S.Ct. at 658–59.[14] A recent Supreme Court opinion casts some doubt on the appropriateness of agency determinations in situations such as this.

In *Smiley v. Citibank (South Dakota), N.A.,* —— U.S. ——, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996), the Court said:

> We accord deference to agencies under *Chevron* [*U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)] not because of a presumption that they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows. See *Chevron, supra,* at 843–844 [104 S.Ct. at 2781–2782]. Nor does it matter that the regulation was prompted by litigation, including this very suit. *Of course we deny deference "to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice,"* Bowen v. Georgetown Univ. Hospital, 488 U.S. 204, 212 [109 S.Ct. 468, 473–474, 102 L.Ed.2d 493] (1988). *The deliberateness of such positions, if not indeed their authoritativeness, is suspect.* (emphasis added).

As stated in TVA's brief,

**13.** While there is an "exception," discussed in *Hardin* not at issue here, which provides: "Nothing in this subsection shall prevent [TVA] or its distributors from supplying electric power to any customer within any *area* in which [TVA] or its distributors had generally established electric service on July 1, 1957, and to which electric service was not being supplied from any other source on the effective date of this Act" (emphasis added), the Court concluded that this "excep-

tion" did not affect its interpretation and application of the initial limiting clause.

**14.** This court agrees with Justice Harlan's observation that " 'economic and engineering aspects' ... [which] may influence the Authority's wish to expand its area of service" should not "prescribe the terms or stringency of Congress' prohibitions against expansion." *Id.* at 14, 88 S.Ct. at 659.

It is, of course, axiomatic that statutory interpretation begins with the words of the statute, as the Supreme Court reiterated in *Norfolk & W. Ry. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 128 [111 S.Ct. 1156, 1163, 113 L.Ed.2d 95] (1991):

> As always, we begin with the language of the statute and ask whether Congress has spoken on the subject before us. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress" [citation omitted].

Furthermore, as the Court explained in *Nationsbank [NationsBank] v. Variable Annuity Life Ins. Co.,* [513 U.S. 251, ———–——] 115 S.Ct. 810, 813–14 [130 L.Ed.2d 740] (1995):

> "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." ... *If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment "controlling weight"* (emphasis added).

TVA has further argued, however, that,

> Since the language of Section 15d(a) is clear and unambiguous, it must be deemed conclusive and be given full effect. *Negonsott v. Samuels,* 507 U.S. 99, 104–05 [113 S.Ct. 1119, 1122–23, 122 L.Ed.2d 457] (1993); *Kelly v. Boeing Petroleum Servs., Inc.,* 61 F.3d 350 (5th Cir.1995). *See also Connecticut Nat'l Bank v. Germain,* 503 U.S. 249 [112 S.Ct. 1146, 117 L.Ed.2d 391] (1992).

The court agrees. What TVA argues is an agency interpretation entitled to deference is, in reality, a legal position which it takes in this case.

This court cannot accept the argument that it must simply defer to the *ipse dixit* arguments of TVA as a litigant. See *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988); *National Fuel Gas Supply Corp. v. FERC,* 811 F.2d 1563, 1571 (D.C.Cir.), *cert. denied,* 484 U.S. 869, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987) and *ACLU v. FCC,* 823 F.2d 1554, 1567 n. 32 (D.C.Cir.1987); *William Bros., Inc. v. Pate,* 833 F.2d 261, 265 (11th Cir.1987). Rather than giving TVA the power to make rules or to otherwise carry out legislatively delegated interpretive authority, § 831 n–4 requires changes to be "specifically authorized by Act of Congress." *Cf. Adams Fruit Co. v. Barrett,* 494 U.S. 638, 649, 110 S.Ct. 1384, 1390–91, 108 L.Ed.2d 585 (1990).

The record suggests that TVA's decision to sell to LPM resulted from a desire to change policy rather than from an interpretation of the 1959 Act. Its current Chairman has been quoted as saying, "[T]he fence, [the area restriction] no longer makes sense. And when it comes down, competition will be a two-way street, and TVA will once again have the freedom to compete anywhere in the country [as it did prior to 1959]. We had that freedom until 1959. It's time we had it again. It's time to set TVA free" (emphasis added) (Px. 39). The record indicates that previous TVA chairmen have not been so aggressive in attitude.

The case of *Young v. Tennessee Valley Authority,* 606 F.2d 143 (6th Cir.1979), *cert. denied,* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 776 (1980), likely states the correct general law with regard to TVA's construction of statutes. The court stated:

> In considering the legality of agency action under an enabling statute, we do not write on a clean slate. Ordinarily, a court should give great weight to the frequent, consistent, and long standing construction of a statute by an agency charged with its administration....

> Particularly this is true with respect to a statute which is reasonably susceptible of two different interpretations. The construction of a statute by those agencies charged with its execution should be followed unless there are compelling indications that it is wrong, especially when Congress with knowledge of the facts has consistently taken no steps to prohibit or curtail the administrative actions; but has approved them.

*Young,* 606 F.2d at 145 (citations omitted). This court does not conclude, however, that, here, there has been a "frequent, consistent, and long standing" construction of the statute. Further, there are compelling reasons to believe that the construction that TVA would place on the statute is wrong and that its interpretation is case-expedient. Further, the court does not conclude that Congress has ratified any such purported construction.[15]

### Court's Statutory Interpretation

■ It is generally recognized in Kentucky, as well as in other jurisdictions, that mere ownership of the capital stock of one corporation by another "does not create an identity of corporate interest." *Big Four Mills Ltd. v. Commercial Credit Corp.,* 307 Ky. 612, 616, 211 S.W.2d 831, 834 (1948); *Board of Tax Supervisors of Jefferson County v. Baldwin Piano Co.,* 296 Ky. 673, 677–78, 178 S.W.2d 212, 214 (1944); *Kentucky Electric Power Co. v. Norton Coal Mining, Co.,* 93 F.2d 923 (6th Cir.1938); *White v. Winchester Land Dev. Corp.,* 584 S.W.2d 56 (Ky.Ct.App.1979).

In *Boggs v. Blue Diamond Coal Co.,* 590 F.2d 655, 662 (6th Cir.1979), *cert. denied,* 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979), the court stated,

> Applying "the law as it appears in existing Kentucky decisions," this court declined to disregard the corporate fiction, observing that "[t]he approach of the Kentucky Courts to piercing the corporate veil has been described as evincing 'a general aversion for any disregard of the corporate entity.'" *Id.* [*Poyner v. Lear Siegler, Inc.,* 542 F.2d 955,] at 958. [ (6th Cir.1976).] We noted "it would be an unprecedented extension of the Kentucky doctrine to disregard [the subsidiary's] separate corporate existence." *Id.* at 961.

Whatever the semantics, it is unusual to find the parent corporation arguing that the corporate "fiction" should be disregarded, or that the "corporate veil" should be "pierced." The separate artificial corporate personalities are usually disregarded only when the corporate device is used to defraud creditors, create a monopoly, circumvent a statute or for the other similar reasons.

●   ●   ●   ●   ●

These cases are based on the traditional view that a business enterprise has a range of choice in controlling its own corporate structure. But reciprocal obligations arise as a result of the choice it makes.

A number of cases have recognized that "grandfather" clauses do not extend to separate allied corporations resulting from various corporate ownerships. In *Central Mortgage Co. v. Commonwealth, Insurance Department,* 100 Pa.Commw. 233, 238, 514 A.2d 956, 958 (1986), the court stated:

> We acknowledge that the grandfather clause operates to freeze the status quo of those companies which were validly in the insurance business prior to the effective date of Section 641(b). But we decline to read it as *expanding* those rights so as to advantage an acquiring corporation (here PSFS) by permitting it now for the first time to engage in the insurance business to the possible detriment (as perceived by the General Assembly) of independent insurance agencies.

■ Where there is an express exception, it comprises the only limitation on the operation of the statute and no other exceptions will be implied. See *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980). One who claims the benefit of an exception from the prohibition of a statute has the burden of proving that its claim comes within the ex-

---

15. Again, see the provision in § 831n–4 which provides, "Unless otherwise specifically authorized by Act of Congress...." Defendants' strongest argument may be that TVA has already supplied power to affiliates of other 1959 excepted entities and that neither Congress, plaintiffs or entities similarly situated to plaintiffs have objected. This argument does not address, however, the provision in the 1959 amendment which requires changes to be "specifically authorized by Act of Congress." The court does not decide, one way or the other, whether sales by TVA to such other entities have been or are analogous to the sales to LPM or whether such sales themselves, if they take place, are prohibited. The court is simply doing what the parties have suggested, applying the language of the statute.

ception. *United States v. First City Nat'l Bank of Houston,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967). *Cf. Mills Music, Inc. v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985).

In *In re, Beck Industries, Inc.,* 479 F.2d 410, 418 (2d Cir.1973), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973), the court stated,

> Where a parent corporation desires the legal benefits to be derived from organization of a subsidiary that will function separately and autonomously in the conduct of its own distinct business, the parent must accept the legal consequences, including its inability later to treat the subsidiary as its alter ego because of certain advantages that might thereby be gained. In short the parent cannot "have it both ways." The words of the Supreme Court in *Schenley Distillers Corp. v. United States,* 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946), although stated in another context, are appropriate:
>
> > "While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages...."

In a somewhat analogous situation, the court in *National Association of Casualty & Surety Agents v. Board of Governors of the Federal Reserve System,* 856 F.2d 282, 285–286 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1090, 109 S.Ct. 2430, 104 L.Ed.2d 987 (1989), stated:

> The Board thought that both the legislative history and the terms of the statute itself suggested a congressional intent that Exemption D privileges be identified with the precise entity that originally qualified for them. The Board quoted the Senate Committee Report which states that "[t]he authority to engage in activities under [Exemption D] only extends to the entity, be that the Holding Company itself or a subsidiary or subsidiaries thereof, which qualifies for the grandfathered activities status." *Id.* (quoting S.REP. NO. 536, 97th Cong., 2d Sess. 40 (1982) U.S.Code Cong.

& Admin.News pp. 3054, 3094). Thus, if a bank holding company owned three banks, only one of which qualified under Exemption D to sell insurance, the other two banks, or any other subsidiaries or affiliates of the bank holding company, could not sell insurance, because "exemption D rights attach [only] to the entity actually conducting the activity on the grandfather date." *Id.* The Board concluded from the circumscribed nature of Exemption D rights that "the intent of the statute is that the grandfathered subsidiary continues to be able to engage in the activity, even if acquired by another bank holding company so long as the subsidiary complies with the geographic and functional limitations proscribed [sic] in exemption D." *Id.*

In *People's Gas Light & Coke Co. v. City of Chicago,* 194 U.S. 1, 16–17, 24 S.Ct. 520, 524, 48 L.Ed. 851 (1904), the Court stated:

> By the state Constitution the general assembly was forbidden to make 'any irrevocable grant of special privileges or immunities,' and the general rule is that a special statutory exemption, such as immunity from taxation, from the right to determine rates of fare, or to control tolls, and the like, does not pass to a new corporation succeeding others by consolidation or purchase, in the absence of express direction to that effect in the statute. *St. Louis & S.F.R. Co. v. Gill,* 156 U.S. [649] 656, 15 Sup.Ct.Rep. 484, 39 L.Ed. [567] 569; *Norfolk & W.R. Co. v. Pendleton,* 156 U.S. 667, 15 Sup.Ct.Rep. 413, 39 L.Ed. 574; *Covington & L. Turnp. Road Co. v. Sandford,* 164 U.S. [578] 586, 17 Sup.Ct.Rep. 198, 41 L.Ed. [560] 562; *Minneapolis & St. L.R. [Ry.] Co. v. Gardner,* 177 U.S. 332, 20 Sup.Ct.Rep. 656, 41 L.Ed. 793; *Georgia R. & Bkg. Co. v. Smith,* 128 U.S. 174, 9 Sup. Ct.Rep. 47, 32 L.Ed. 377. And the same rule is applicable where the constituent companies are merely owned and operated by one of them as authorized by the legislature. An exemption held by the latter would not pass to the others unless so provided. So that the act of 1897 cannot be construed as extending any prior immunity the acquiring company possessed over

the whole system of all the companies consolidated.[16]

In *Tennessee Valley Authority v. Exxon Nuclear Co.*, 753 F.2d 493, 497 (6th Cir.1985), the court stated:

It is well established that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent corporation will not be liable for the obligations of its subsidiaries. 1 *W. Fletcher Cyclopedia Corporations*, § 43 (rev. perm. ed. 1983). In certain instances, courts have permitted the corporate veil to be pierced. But this is generally done to impose liability on a parent corporation, and only after a strong showing of such control of the subsidiary by the parent to effectively render the subsidiary a mere instrumentality of the parent, and of some fraud connected with the use of the parent/subsidiary corporate form.

■ Defendants correctly argue that the ultimate law which the court should look to is federal law, not state law. Defendants have cited *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981) which states:

Although the state law arguments advanced here that MATEP's corporate veil should not be pierced do not apply, there is also some federal law on piercing the corporate veil. This law has developed in cases involving other regulatory statutes as different as the Clayton Act, *see*, e.g., *Klinger v. Baltimore & Ohio R.R.*, 432 F.2d 506 (2d Cir.1970), the Interstate Commerce Act, *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 66 S.Ct. 247, 90 L.Ed. 181 (1946) (per curiam), and the Communications Act of 1934, *Capital Telephone Co. v. FCC*, 498 F.2d 734 (D.C.Cir.1974). The general rule adopted in the federal cases is that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Id.* at 738 (citations omitted). In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, *see Schenley Distillers Corp. v. United States*, 326 U.S. at 437, 66 S.Ct. at 249; *Flink v. Paladini*, 279 U.S. 59, 62, 49 S.Ct. 255, 255, 73 L.Ed. 613 (1929), an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine, *Capital Telephone Co. v. FCC*, 498 F.2d at 738–39.

*Gorsuch* appears to state the general federal law. See also *Hansen v. Huston*, 841 F.2d 862, 864 (8th Cir.1988). ("Under federal law, state law doctrines of corporate autonomy may be disregarded when the corporate form is being used to defeat the ends of federal law").[17]

In *Crescent Express Lines v. U.S.*, 320 U.S. 401, 407–09, 64 S.Ct. 167, 170–71, 88 L.Ed. 127 (1943), the Court considered a grandfather clause and the "meaning given to the word, 'business.'" The Court stated, "The appellant argues that it would be engaged in the same business if, in lieu of using seven-passenger sedans, it undertook to haul larger numbers of passengers in buses." The Court held that, "To authorize the appellant to change to the business of carrying passengers by bus would alter the position in the transportation business which it occupied on June 1, 1935." Further, "When Congress provided for certificates to cover all carriers which were already in operation, it did not throw open the motor transportation system to more destructive competition than that already existing . . . ."

Further, "The statute, we have said, contemplated substantial parity between future and prior operations. . . . As the Act is remedial and to be construed liberally, the proviso defining exemptions is to be read in harmony with the purpose of the measure

---

**16.** *Cf. Shaw v. City of Covington*, 194 U.S. 593, 24 S.Ct. 754, 48 L.Ed. 1131 (1904).

**17.** This does not answer the question here of which side is trying to "defeat the ends of federal law." There is no fraud or injustice involved in an interpretation of the statute. Neither does fairness or equity appear to be implicated. Many of the cases cited by the defendants are cases wherein for reasons of fairness, equity, etc. *liability* was imposed on a corporate entity. If "convenience" is an issue, whose convenience?

and held to extend only to carriers plainly within its terms."

LPM acknowledges that LPM and LG & E "are not the same corporate entity." It argues, however, that "The issue is whether LPM and LG & E are a part of the same organization." The court disagrees. The court is of the opinion that the underlying issue is whether LPM alone or as an affiliate of LG & E can be considered an "organization" which was contemplated by the 1959 Act. Under some definitions of "organization," LPM and LG & E are not even now part of the same organization. Unquestionably, LPM was not one of the "organizations" contemplated by Congress in 1959. The fact that it may pass on all the profits it generates from sale of TVA power to LG & E does not change the fact that it was neither in existence nor contemplated in 1959.[18] Could LG & E bring any corporation in the country under a pre–1957 contract with TVA by merely requiring that it pay all its profits on sales of TVA power to LG & E? This court thinks not. Likely, all the agreement(s) which exist between LG & E and LPM could be made by LG & E with any corporation if approved by regulatory authorities.

LPM argues that "Had Congress intended such nonsensical interpretation [that Congress intended 'organizations' which were in existence in 1957], TVA would have been barred from entering into exchange power transactions with [Alcoa]." Alcoa was specifically contemplated and excepted in the 1959 Act. It is specious to argue that since Alcoa is excepted in the 1959 Act, its status has some bearing on a decision related to LPM.

Some of the arguments and counter arguments of the parties have concerned whether LG & E, like LPM, has the authority to sell in the national wholesale bulk power market, power not generated by it. Apparently the parties agree that LG & E cannot so sell power generated by others at unregulated or "market-based" rates, as LPM can do.[19]

TVA argues, "We note, however, that principles of corporate law as such do not govern the issues presented here involving the meaning of the TVA Act. Rather, the determinative factors are what Congress said and what it meant by Section 15d(a) and how TVA has construed and applied the provision." While the intent of Congress is, of course, paramount, and while principles of corporate law may not totally "govern," this court is of the opinion that such principles must be at least considered in determining the intent of Congress.

TVA acknowledges that there was not only a reorganization in 1990 when Energy Corporation became LG & E's parent, but also in 1994. TVA argues,

> In 1994, LG & E underwent a further reorganization. At that time, the function of the marketing of surplus power off-system from LG & E's service area, which had historically been done by LG & E itself, was transferred to newly formed corporate affiliate, LPM. Freibert aff. ¶ 4; Friebert supp. aff. LPM is a third-tier wholly-owned subsidiary of LEC, and like LG & E is wholly owned by LEC.

Defendants argue that "two affiliated corporations, functionally related by a common purpose, constitute an organization."[20] The

18. The 1942 Agreement between TVA and LG & E provided:

> Company covenants and warrants that all obligations assumed by it in this agreement shall be discharged by it or by an existing subsidiary or by a subsidiary to be created as provided in this Article IX. Any reference in this agreement to "Company" shall be construed to include the Company or its subsidiaries to be created as provided in this Article IX.

The "subsidiaries to be created" are specifically named in Article IX. The 1942 power exchange agreement between TVA and LG & E provides: "This agreement shall inure to the benefit of and be binding upon the successors and assigns of the respective parties." The court concludes that LPM is neither a successor nor an assignee of LG & E. LG & E still has *its* contract with TVA.

19. There is no suggestion, in the TVA statutes' statements of the primary purposes, that Congress intended that TVA be a primary source of supply of electric power to serve the national market. The suggestions are to the contrary.

20. It should be noted that the reorganization here at issue was not, in pertinent part, a merger. A merger might result in a different legal analysis which considers which of the corporations is absorbed.

issue is whether such an 'organization' existed in July 1957. If LG & E and LPM had been affiliated in 1957, defendants' argument might be more persuasive. The parties have quoted various definitions of the term "organization" designed to suit their respective purposes. Under no definition did LPM exist in 1957. This court is less inclined than others to re-write the law. TVA and LPM have access to Congress if that is their desire.

Defendants argue that "The net effect of this relationship to LG & E and to third parties is the same as if LG & E had purchased the power from TVA itself and resold it, with the exception that LPM bears the risk of the transactions not being profitable rather than LG & E and its ratepayers." This statement itself illustrates at least one of the reasons the corporations are considered to be separate entities. In the various filings quoted from above, Energy Corp. and LG & E went to great lengths to emphasize the separateness of the entities and how LG & E is insulated from the activities of other affiliates. They also emphasized the advantages over the old "organization," including the benefits of not being regulated, expanded business opportunities, etc.

It may be that LG & E could conduct the same type sales as does LPM. On the other hand, its doing so could well violate the spirit, if not the letter, of the 1959 Act. The court again notes that the *sale* of power is provided for in both the first quoted proviso of § 831k and in the initial limiting provision of § 831n–4. It is not used in the exception here under consideration. Both §§ 831k & 831n–4 have separate "exchange" provisions. Since both §§ 831k & 831n–4 make a distinction between sale and exchange, the right of even any of the 1957 "organizations" to simply purchase power for resale outside the confined area is questionable.

This distinction in § 831k was discussed in a letter from TVA to Central Illinois Public Service Company (Px. 34). The letter states:

This agreement [with Central Illinois Public Service Company] is not one for a sale of TVA power, *but* is an exchange power arrangement. These two types of transactions are basically different, and I am unable to agree ... that under section 12 of the TVA Act (16 U.S.C. 831k) "an 'interconnect with other systems' is deemed to be a sale of power." The last proviso of section 12 authorizes contracts with other power systems for exchanges of unused excess power, for conservation of stored water, and as an emergency or breakdown relief. The authorization for exchange power arrangements is separate from and in addition to that for power sales contracts....

. . . .

Section 15d of the TVA Act (16 U.S.C. 831n–4), which was adopted as an amendment in 1959, reaffirms the distinction between sales contracts and exchange arrangements.

While this court does not reach the issue of whether TVA can make blanket *sales* of power to even the power generating organizations contemplated by the 1959 Act, the court notes that terms "direct and indirect" must have some meaning.

The references to *exchange* of power with power generating organizations suggests that Congress did not intend that TVA be a source of power through *sales* to non-power generating organizations. Even though exchanges with such excepted power generating organizations may take the form of sales and purchases, sales to non-power generating organizations which were not even in existence in 1957 do not fall within the contemplation of the 1959 Act's exception. The 1959 Act is very specific as to the intended exceptions. It seems clear that Congress did not intend "exchanges" by entities that do not generate power which they can exchange.[21]

---

21. The court does not have before it a case which questions the right of Savannah Electric and Power Company, or any entity other than LPM, to buy TVA power. At oral argument, TVA's attorney said, "And it's not material whether the plaintiffs, themselves, are actually reselling power at this time. The question is what does the statute require or prohibit?" The court agrees. Paraphrasing a statement made by Chief Justice Marshall, it is a statute that we are expounding.

See *Gonzales v. Garner Food Services, Inc.*, 89 F.3d 1523 (11th Cir.1996) ("The cardinal rule of statutory construction is that the language of a

An interesting argument made by LPM is the following:

> At the time Section 15d was enacted, Congress was aware that there were important statutory restrictions in place with respect to the operations and corporate structures of public utilities. These laws provide insight into the type of corporate organizations and activities in which Congress intended to allow utilities, such as LG & E and Plaintiffs, to engage.

This suggests that Congress may well have intended to restrict sales of TVA power to regulated utilities unless otherwise specified. At oral argument, TVA's attorney argued that, "Our position is that LPM is part of a power generating organization which is eligible to [receive] TVA power and that, of course, is Louisville Gas & Electric." LPM is clearly not "part of" LG & E. There is a certain irony in the fact that LG & E can't sell power to LPM but, arguably, TVA can. In effect, TVA says that the term "organization" is broad enough to include any group which TVA wants it to include.

In order to reach the conclusion urged by TVA and LPM, the court would have to disregard all of the following:

1. That LPM is not a power generating organization which generates power to exchange.

2. That LPM is an entity which didn't exist in 1957.

3. That the addition of the subject contract gives LG & E and its affiliate, not one contract of exchange, but two contracts; one of exchange, with some purchase and sale to and from TVA; and one of purchase (and maybe some sale to TVA) only.

4. The requirement that changes must be specifically authorized by Act of Congress.

5. The distinction which Congress itself has made between purchase and sale and exchange.

6. *Hardin's* recognition that the purpose of the 1959 Act was to protect private utility companies from TVA competition.

7. The fact that LPM can engage in businesses and make sales which LG & E cannot as emphasized in documents created by LG & E during the time of the creation of the holding company.

8. The case law which suggests that LG & E and LPM are not the same organization.

9. Statements by TVA's own experts and its earlier officials which suggest that sales of power to LPM by TVA are unlawful.

10. Legislative history which expresses concerns about such attempts to stretch the Act.

Balanced against these and perhaps other factors is TVA's desire to expand its sales of power and its purported entitlement to deference to its view in this quest, without its having obtained approval of Congress. To allow this would be to place TVA in the same position as it was prior to the passage of the 1959 Act. This court cannot be a party to such machinations.

LPM's brief dated August 21, 1996 argues that the specter of competition "fuels this litigation." Further, that "Plaintiffs' complaint is not that the TVA/LPM contract reduces competition, but that LPM is competing with the plaintiffs in the national wholesale market." Further, "It is clear that the Power Companies are feeling the sting of potential competition." The brief is replete with other suggestions of competition and the plaintiffs' desire to avoid this competition. While the arguments may be very persuasive if presented to Congress, they are counterpersuasive here, both as to "standing" and as to the reasons given for the 1959 Act in *Hardin.*

Defendants would have the court apply some trinitarian type doctrine and determine that Energy Corp., LG & E and LPM are three entities in one. The court cannot make this theologically based leap. The very fact that TVA continues to sell to LG & E under one contract and to LPM under another contract suggests that the two contracts are not with the same "organization." Whatever the

statute should be interpreted in accordance with its ordinary, contemporary, and common meaning.... Absent clearly expressed legislative in-

tent to the contrary, the plain language of the statute should be conclusive.").

holding company and its subsidiaries are now, they are not the same "organization" which existed In 1957. LG & E is the same, they are not. If Congress deems that sales to an affiliate corporation would satisfactorily meet its 1959 purpose of protecting private competition, that issue must be addressed by Congress rather than by either this court or TVA expanding the language Congress used in 1959. Neither this court nor TVA should make such a legislative decision.

As illustrated by the *Hardin* case, decisions of this type depend more on who has the final authority than on either pure logic or law. In *Hardin,* the district court made a decision which was reversed by the circuit court whose decision was, in turn, reversed by the Supreme Court, with a dissent.

Paraphrasing the language used in *Hardin,* one could argue that,

> "Given the innate and inevitable vagueness of the ["organization"] concept and the complexity of the factors relevant to decision in this matter, we think it more efficient, and thus more in line with the overall purposes of the Act, for courts to take TVA's ["organization"] determinations as their starting points and to set these determinations aside only when they lack reasonable support in relation to the statutory purpose of controlling, but not altogether prohibiting, territorial expansion."

*Id.* at 9, 88 S.Ct. at 656.

Any final decision which is made will likely be somewhat subjective. This court cannot, however, defer to TVA and hold that a separate corporation which was not even conceived of until 1990 is part of a 1957 organization. An apple does not become an orange because TVA says that it is. If the court accepted TVA's argument, two organizations would become one organization and one contract would become two contracts.[22] If the situation is the same as it would be with LG & E alone, there was no need for TVA to contract with LPM.[23]

The court will grant the Power Companies' Motion For Summary Judgment filed on April 30, 1996. Within ten days, plaintiffs will submit a proposed final judgment consistent with the conclusions of this Memorandum Opinion. The judgment will provide that its effect is stayed for sixty days to give the defendants an opportunity to seek further stay from the Eleventh Circuit Court of Appeals. The defendants will have ten days to object to the form and content of the proposed judgment. Objections to content will be limited to matters perceived to be inconsistent with the court's opinion.

---

**22.** "Property was thus appalled,
That the self was not the same;
Single nature's double name.
Neither two nor one was called.
Reason, in itself confounded,
Saw division grow together,
To themselves yet either neither,
Simple were so well compounded."
The Phoenix and Turtle, Sonnet, William Shakespeare.

**23.** During its consideration of this case, the court raised the question of whether TVA and LPM are complying with the provisions of § 831k which require that TVA sales of power to for profit corporations be accompanied by requirements that resales of such power be at rates not exceeding a schedule fixed by TVA. The defendants' answer seems to be that TVA is not "selling" power to LPM but is "exchanging" power with LPM. This seems to be another "stretch" of realism. In any event, the court adheres to its conclusion that LPM is not an "organization" contemplated by the 1959 Act.